Charlene **TALBOT**, Joseph DiGiorgio, Mardig Kachian and Delores Jackson, Plaintiffs,

v.

George **ROMNEY**, Secretary, Department of Housing and Urban Development, S. William Green, Regional Administrator, Department of Housing and Urban Development, Albert Walsh, Administrator, New York City Housing and Development Administration, and the City of New York, Defendants.

No. 70 Civ. 2402.

United States District Court, S. D. New York.

Aug. 20, 1970.

MFY Legal Services, New York City, for plaintiffs; Lester Evens, Jeffrey G. Stark, New York City, of counsel.

J. Lee Rankin, Corporation Counsel, New York City, for City of New York; George Newman, New York City, of counsel.

Whitney North Seymour, U. S. Atty., New York City, for United States of America; Peter A. Herbert, New York City, of counsel.

## OPINION

LASKER, District Judge.

This motion raises important questions regarding both the extent to which the federal courts may intervene in government relocation of persons being displaced by urban renewal programs and the degree to which government must demonstrate a readiness to proceed with the development of its project before undertaking the enforced displacement of project area residents and the clearance of otherwise habitable dwellings.

Plaintiffs, artist-tenants of 360 Greenwich Street and 179 West Street in New York City, have moved for a preliminary injunction to enjoin the defendants from proceeding, in connection with the Washington Street Urban Renewal Project ("the project"), with the demolition of these premises and their eviction therefrom. Defendant City of New York has counter-moved to dismiss the complaint for failure to state a claim upon which relief can be granted or, in the alternative, for summary judgment.

Plaintiffs base their action on defendants' alleged violations of the policy and provisions of the Housing Act of 1949, as amended, 42 U.S.C. § 1441 et seq., and the regulations promulgated thereunder. They invoke the jurisdiction of this court pursuant to 28 U.S.C. § 1331, which provides for federal court jurisdiction of all civil actions arising under federal law wherein the matter in controversy exceeds $10,000; 28 U.S.C. § 1361, which provides for federal court jurisdiction of mandamus actions to compel an officer, employee, or agency of the United States to perform a duty owed to the plaintiff; and 28 U.S.C. §§ 2201, 2202, which provide for declaratory judgment and other necessary relief. That this court has subject matter jurisdiction herein is not, and indeed cannot be, contested. See Norwalk CORE v. Norwalk Redevelopment Agency, 395 F. 2d 920, 926, at n. 6 (2d Cir. 1968).

Plaintiffs Talbot and DiGiorgio, a writer and a painter respectively, have been residents of 360 Greenwich Street for the past nine years. Talbot presently occupies a five-room apartment there, one room of which she uses as an office, at a monthly rental of $21. As for DiGiorgio, he now occupies a five-room apartment as living space at $23 per month and a four-room studio, in which he works as a painter of large abstract canvasses, at $32 per month. Plaintiff Kachian, a sculptor, is the sole tenant of 179 West Street. He formerly occupied

part of the second floor for residential use at a rental of $75 per month, and part of the fourth floor, approximately 3400 square feet, as his studio, also at a monthly rental of $75. These two spaces were later consolidated and his total rent reduced to $75 per month. This loft building has, in addition to the normal single phase wiring, a three phase power line which plaintiff Kachian needs for some of his carpentry work.

Plaintiff Delores Jackson, a mother of two infant children presently residing with an aunt at 159–26 Harlem River Drive, New York, New York, is described in the complaint as having been without a residence since February 24, 1970 when the New York City Department of Social Services terminated her welfare assistance. Since that time she has allegedly been unable to find adequate housing in New York City for herself and family despite diligent search.

These four plaintiffs have brought this action for temporary and permanent injunctive relief against George Romney, Secretary of the United States Department of Housing and Urban Development ("HUD"); S. William Green, Regional Administrator of the United States Department of Housing and Urban Development; Albert Walsh, Administrator of the New York City Housing and Development Administration ("HDA"), the local public agency ("LPA") authorized to undertake urban renewal programs on behalf of New York City; and the City of New York.

Charging defendants with allegedly inadequate relocation efforts under the mandate of the federal housing statute, plaintiffs request that the defendants be preliminarily and permanently enjoined from proceeding with the demolition of the premises at 360 Greenwich Street and 179 West Street, or the eviction of plaintiffs Talbot, DiGiorgio and Kachian therefrom, until such time as defendants have undertaken appropriate and lawful steps for relocating plaintiffs, and until such time as projects planned for the re-newal site have been authorized by all appropriate governmental bodies and sponsors for such projects have demonstrated their readiness, ability and willingness to proceed forthwith to construct on the renewal site. The complaint also asks for a permanent injunction requiring defendants to house plaintiff Jackson in one of the unoccupied apartments in 360 Greenwich Street, at a reasonable rental, until such time as the other tenants therein are lawfully removed.

The history of the instant renewal project is not in dispute. Section 101(c) of the Act, 42 U.S.C. § 1451(c), provides that as a prerequisite to obtaining any federal financial assistance in the development of a community (as opposed to a particular project within that community) a local agency must present for certification by the Secretary of HUD a "workable program for community improvement." Pursuant thereto, such a program was submitted by New York City and approved by HUD in July 1959. (The program was recertified in April 1963 and in May 1964.) On November 7, 1960, the federal government, through the Housing and Home Finance Administrator (presently the Secretary of HUD), and the City of New York entered into a Survey and Planning Contract providing the City with an advance of federal funds for the purpose of formulating an urban renewal plan. On January 25, 1962, the Board of Estimate of the City of New York adopted by resolution a project known as the Washington Street Urban Renewal Project. Subsequently, the City submitted an application for a Capital Grant which contained, in accordance with the Act, the urban renewal plan itself, as well as a plan for the relocation of persons to be displaced from the urban renewal area. HUD reviewed the application and, on or about March 12, 1963, found it to be acceptable. The Mayor of the City of New York gave his approval to the project on January 26, 1965, and on February 1, 1965, the City entered into a Capital Grant Contract with

HUD providing funds for the actual construction and development of the project. Title to all of the land within the project, bounded generally by Hubert Street, Greenwich Street, Barclay Street and West Street, passed to the City on March 1, 1965, by order of the New York State Supreme Court. On January 30, 1969, the City moved the State Supreme Court to put it into possession of the premises located within the project, including 360 Greenwich Street and 179 West Street. This motion was granted by order dated February 28, 1969, with execution stayed until September 1, 1969. On April 9, 1969, the City, with HUD's approval, signed a contract with Nationwide Wreckers, Inc. for the demolition of 47 structures located within the Washington Street urban renewal area, including those at 360 Greenwich Street and 179 West Street. On September 25, 1969, a meeting was held at 204 Franklin Street with the remaining site tenants, among whom were plaintiffs Talbot and Kachian, at which time they were notified that the final writ date of September 1, 1969 had passed and that the process of clearing the area would shortly commence. Between March and April, 1970, plaintiffs Talbot, DiGiorgio and Kachian were notified either personally or in writing of the impending execution of the writs of assistance, and on June 8, 1970, plaintiffs received written notice that their eviction by Harry Weisberg, Senior Deputy Sheriff, City of New York, was scheduled for June 10, 1970.

Thereafter, on June 9, 1970, plaintiffs obtained a temporary restraining order, which remains in effect pending the outcome of the instant motion, staying all proceedings on behalf of the defendants or any sheriff of New York City to evict plaintiffs or demolish the premises at 360 Greenwich Street and 179 West Street.

Relying upon the complaint as well as affidavits in support of and in opposition to the motions for preliminary relief and summary judgment, plaintiffs contend that it is an arbitrary abuse of administrative discretion for defendants Romney and Green to fund the Washington Street Urban Renewal Project in that (1) the City's original relocation feasibility plan, its subsequent relocation reports, and the actual relocation efforts made by the City on behalf of the named plaintiffs have not met the requirements of Section 105(c) of the Act, 42 U.S.C. § 1455(c), and HUD regulations adopted pursuant thereto; (2) the City has failed to offer a "workable program" within the meaning of 42 U.S.C. § 1451(c) inasmuch as construction plans for the renewal site are, and have been for the past ten years, still in a preliminary stage; and (3) given the absence of any plan for timely construction on the project site, the proposed immediate demolition of habitable dwellings at a time of severe housing shortage in the City of New York constitutes a violation of the declared policy of the Act that every American family should be decently housed. 42 U.S.C. § 1441.

Defendants oppose the application for preliminary injunction, and defendant City of New York also moves to dismiss the suit, upon the grounds that plaintiffs lack legal standing to maintain this suit, that plaintiffs' objections are based on too literal an interpretation of the requirements of the Act, and that defendants have in fact met the requirements imposed on them by the relocation law.

### I.

Two procedural matters must be disposed of at the outset. First, inasmuch as matters outside of plaintiffs' pleadings have been presented to and not excluded by the court, the motion to dismiss by defendant City of New York will be treated as one for summary judgment as prescribed by Rule 12(b) of the Federal Rules of Civil Procedure.

Secondly, defendant City's contention that plaintiffs have no standing to raise the issues presented herein must be summarily rejected. Plaintiffs do not challenge the propriety or legality of the project itself, or the condemnation of the land in the project site. They

merely raise a statutory claim of inadequate relocation under the Act and challenge HUD's continued funding of the project in the absence of compliance with the mandates of the federal statute.

That displaced residents have standing to sue to obtain judicial review for the protection of interests specifically recognized in the Housing Act was decided beyond cavil by the Second Circuit in the leading case of Norwalk CORE v. Norwalk Redevelopment Agency, *supra*. There the court stated, 395 F.2d at 932–933:

"Since the section [42 U.S.C. § 1455(c)] requires provision for the relocation of displaced families, it can hardly be thought that displaced families such as plaintiffs, do not have the required personal stake in the outcome of litigation where a violation of the section is claimed. If anybody can raise this claim, it is these plaintiffs. The question we must answer is whether actions taken by HUD and local public agencies under section 105(c) are ever subject to judicial review.

"The proposition is now firmly established that 'judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.' (citations omitted). We have concluded that plaintiffs are aggrieved, and that there is no persuasive reason to believe that Congress intended to cut off judicial review."

See also Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D.Cal.1968); Powelton Civic Home Owners Ass'n v. Department of Housing and Urban Development, 284 F.Supp. 809, 825 (E.D.Pa.1968) ("We have concluded that the relocation provisions of 42 U.S.C. § 1455(c) (1) and (2), both in their substantive and in their procedural implications, are intended for the protection of these particular plaintiffs and do provide standing in this case.")

## II.

Accordingly, we may proceed to analyze plaintiffs' substantive claim that the City's relocation plans, relocation reports and relocation efforts have fallen short of the standards required by the federal statute.

Congress has provided in Section 1455(c) of the Act, that the standard for relocation is "decent, safe and sanitary dwellings" in the urban renewal area or in other areas not generally less desirable, within the financial means of the families displaced. Compliance therewith is achieved by requiring that contracts and grants shall be made "only with a duly authorized local public agency" (here, HDA), and that such a contract shall require that there be a "feasible method" for temporary relocation of individuals and families displaced from the urban renewal area, and that there are, or are being provided, in the urban renewal area, or in other areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the individuals and families displaced from the urban renewal area, decent, safe and sanitary dwellings equal in number to the number of and available to such displaced individuals and families and reasonably accessible to their places of employment. 42 U.S.C. § 1455(c) (1).

In addition, in 1965 Congress adopted an amendment, 42 U.S.C. § 1455(c) (2), which provides:

"As a condition to further assistance after August 10, 1965 with respect to each urban renewal project involving the displacement of individuals and families, the Secretary shall require, within a reasonable time prior to actual displacement, satisfactory assurance by the local public agency that decent, safe, and sanitary dwellings [as required by subsection (c) (1)] are available for the relocation of each such individual or family."

Section 1455(c) (1) also provides that the Secretary shall issue rules and regu-

lations to aid in implementing the requirements of this subsection in particular and the objectives of the Act in general.

Plaintiffs charge that defendants have failed in several respects, some more substantial than others, to comply with federal guidelines in the planning, reporting and executing stages of relocation. As noted earlier, the City's original relocation feasibility plan was submitted in 1963 as part of its application for a Capital Grant, and on or about March 12 of that year was approved by HUD. It is clear from the record before me that HUD itself has rarely, if ever, questioned the City or HDA in their execution of the project. Unlike the factual situation in *Western Addition, supra,* the Secretary of HUD has at all times given his unqualified and unconditional approval to the Washington Street relocation plan. As stated in the affidavit of George M. Beaton, Deputy Assistant Regional Administrator for Renewal Assistance of Region I, HUD, dated June 15, 1970, at p. 2, "[T]o the best of my knowledge, as of this date, no violations of the Act or of HUD regulations exist which would justify the termination of federal funding."

Plaintiffs argue, however, that the content of the relocation plans submitted by the local public agency to HUD is strictly circumscribed by the regulations spelled out in the Urban Renewal Handbook and that HDA has failed noticeably to comply therewith. They note that submission requirements must include, *inter alia,* estimates of displacees (RHA 7212.1 Ch. 1), description of the existing housing supply (*ibid.*), vacancy rates (*ibid.*) rate of construction (*ibid.*), and —of particular concern in the instant litigation—a description of special problems relating generally to minority groups, low income families, large families, individuals or handicapped or elderly site occupants along with an indication of proposed solutions thereto (RHA 7212.1 Ch. 2, Sec. 2).

It is urged that the tenant plaintiffs herein presented, and still present, special problems of relocation, particularly the painter DiGiorgio and the sculptor Kachian, who work in their homes with oversized canvasses and other art materials, and that the LPA (i. e., HDA) has not described these peculiar relocation problems adequately in its submission to HUD, thereby violating the express HUD regulations cited above.

Nevertheless, while plaintiffs may have uncovered a technical violation of the relocation requirements, it would not appear, in and of itself, to approach such magnitude as to justify granting the relief requested here. In this regard, the Second Circuit's caveat in *Norwalk CORE, supra,* 395 F.2d at 937, bears repetition:

"In determining whether there has been compliance with section 105(c) of the Act, courts will evaluate agency efforts and success at relocation with a realistic awareness of the problems facing urban renewal programs. Objections by individual displacees based on too literal an interpretation of the Act's standards could unnecessarily interfere with programs of benefit to the entire community."

Beyond the original relocation feasibility plan submitted to HUD, the LPA is generally required by HUD regulations to submit various interim reports regarding relocation progress. The most significant of these is the so-called "60-day report" regulation added to the Urban Renewal Handbook following congressional adoption of the 1965 amendment, 42 U.S.C. § 1455(c) (2). As noted earlier, section 1455(c) (2) expressly requires the Secretary to obtain "satisfactory assurance" from the local agency within a reasonable time prior to actual displacement of site residents that decent, safe, and sanitary dwellings are actually available for the relocation of each individual and family. Pursuant thereto, the Secretary issued the "60-day report" regulation requiring, in substance, that at least 60 days prior to the expected displacement of a substantial number of area residents the local agency submit a report detailing the proj-

ect's relocation plan and describing the status of the planned relocation resources. The regulation itself provided that the LPA not proceed with such displacement activities until it had received HUD notification of acceptability.

Defendants freely admit that no such 60-day report of intended displacement was ever filed with HUD in connection with the Washington Street project, but contend that their failure to do so does not constitute a violation of either the 1965 amendment itself or the 60-day notice requirement promulgated thereunder. Defendants argue that this 1965 amendment and regulation are not applicable to the Washington Street project because the amendment provided that the requirements imposed by it were not applicable to any urban renewal project which received federal recognition prior to the effective date of the enactment of the new section (August 10, 1965). Section 305(c) of Title III of the Act, Pub. L. 89–117. Defendants urge that, since the present project received "federal recognition" as defined in 42 U.S.C. § 1460(k) as early as November 1960 with the execution of a Survey and Planning Contract for financial assistance in planning the project, it is not subject to the 60-day reporting requirement.

Despite plaintiffs' cogent policy arguments that Congress could not have meant to condition a major advance in the rights of displacees on the fortuitous date of "federal recognition" and must have intended instead to grant prospective application to all those residents not yet displaced, the court cannot lightly disregard the seemingly clear language of the statute, especially upon a request for preliminary relief. In addition, other factual considerations mitigate against the impact of defendants' failure to submit a 60-day notice of adequate relocation resources. First, close to sixty days have already passed since the commencement of this lawsuit, and HUD officials have been made poignantly aware of both the relocation problems affecting these plaintiffs and the relocation resources afforded them now and in the past. HUD is apparently satisfied (whether arbitrarily or not will be dealt with *infra*) with the relocation opportunities made available to plaintiffs, and therefore the actual submission of a 60-day report would be of doubtful efficacy. Second, the Urban Renewal Handbook, RHA 7212.1, Ch. 3, Sec. 2, requires the LPA to submit, in addition to the 60-day report, quarterly reports on the relocation of residents of the project area. Inasmuch as HDA has indisputably been supplying HUD with such quarterly statistical reports regarding the relocation progress of the project, it would seem that the purpose of requiring the 60-day report has been served.

Finally, as regards defendants' alleged relocation violations, plaintiffs contend that federal funding should be terminated and development of the project halted until such time as the named plaintiffs Talbot, DiGiorgio and Kachian are each lawfully and properly relocated. Plaintiffs maintain that as to these individual residents defendants have failed to meet the congressional standard of relocation enunciated in section 1455(c) (1), namely, decent, safe, and sanitary dwellings in the urban renewal area or in other areas not generally less desirable, within the financial means of the individuals or families displaced. Undeniably, as stated by the court in *Norwalk CORE, supra,* at 929: "The executive branch (HUD) is entrusted with the primary responsibility for enforcing this standard." In this connection it should be noted that HUD at least is satisfied that "HDA has made diligent efforts to properly relocate the residents of the project area." (Beaton affidavit, dated June 15, 1970, p. 3).

Nevertheless, plaintiffs assert that the City has made no efforts to relocate them in housing in which they can carry on their artistic endeavors and that the only housing offered plaintiffs has been above their financial means. While the record discloses a sharp disagreement between the parties as to the number and extent of relocation offers

made to plaintiffs by the City (in the case of DiGiorgio, for example, the City claims to have made upwards of seven alternative offers, while he maintains he has received no more than three), nonetheless even the plaintiffs acknowledge the receipt of no less than two to three such tenders per tenant (although they do, admittedly, challenge the less desirable size and higher cost of such apartments). While it is true that some of these offers have been more expensive and others less spacious than plaintiffs' present accommodations, the court cannot be called upon to intervene on behalf of every relocatee not furnished with housing facilities *precisely* equivalent to that which he formerly enjoyed. Furthermore, the job of the City has been rendered all the more complicated in the instant case by the unique occupations and special space and electrical needs of the plaintiffs, as well as by the desire to find, in the midst of the current housing crisis, rentals as low as plaintiffs have been fortunate enough to pay in the past. Defendants' affidavits have also suggested (and plaintiffs have not expressly denied) a somewhat obstructive and uncooperative attitude on behalf of plaintiffs Talbot and DiGiorgio. Indeed, it is alleged that plaintiff DiGiorgio adamantly refused to permit HDA to publish his space needs in a brochure distributed to various real estate agents, owners and other interested persons.

The above factual background must be reviewed in light of the Second Circuit's admonition in *Norwalk CORE, supra,* 395 F.2d at 937, that although judicial review of agency action under section 1455(c) is available to displacees,

"This does not mean, of course, that the courts are to intervene in relocation activities at the behest of every displacee disappointed in his relocation. Familiar doctrines limit the occasions on which particular judicial remedies, if any, are appropriate. In determining whether there has been compliance with section 105(c) of the Act, courts will evaluate agency ef-

forts and success at relocation with a realistic awareness of the problems facing urban renewal programs."

Clearly, too, the HUD regulations provide for the eviction of tenants who refuse "to consider accommodations meeting relocation standards." RHA 7212.1, Ch. 2, Sec. 1, at 7.

■ One further point concerning the City's relocation efforts merits consideration. Recently all three plaintiffs have been offered temporary relocation, at rents presently being paid, in housing scheduled for demolition in the Seward Park Renewal Site. Indeed, the City has also offered plaintiff DiGiorgio storage facilities for his unusually large canvasses for one year at the expense of the City. Similar arrangements have been undertaken for the sculptor, Kachian. Plaintiffs, however, claim (and it is not disputed) that Seward Park in turn is scheduled for clearance and therefore object to such offer as being violative of the Urban Renewal Handbook, RHA 7212.1, Ch. 2, Sec. 1, which states, in pertinent part:

"The LPA shall make referrals to only housing units which are available on a nondiscriminatory basis and are *not scheduled for clearance* under an urban renewal project in planning or execution or other government activity." (Emphasis added.)

Defendants respond that this provision applies to relocation on a permanent basis only, that the Seward Park site is merely a temporary relocation, and that permanent housing will be offered to plaintiffs as soon as possible following their temporary move to Seward Park. They also contend on policy grounds that, while the regulation in question was intended to protect residents of an urban renewal area from being permanently relocated more than once, temporary moves are often essential to meeting timetables of construction and development.

Plaintiffs, in rebuttal, argue that no such distinction between temporary and permanent relocation is to be found in

the wording of the regulation and that the prohibition against referrals to housing scheduled for clearance was intended to be absolute. Plaintiffs also question the sincerity of the City's promise to relocate the plaintiffs in permanent housing as soon as possible. As the record stands, however, especially considering the relative newness of the Seward Park proposal, no reason appears not to take defendants at their word. In addition, the facilities there offered are being held for plaintiffs pending the outcome of this litigation and would appear to be essentially comparable, at least in price if not in size, to the housing accommodations presently occupied by plaintiffs.

As to the legality of the proposed relocation in Seward Park, plaintiffs' objection is regarded seriously, for the language of the regulation does not appear to allow too free a construction. Nevertheless, this single provision should not be read in isolation from other relocation regulations found in the Manual which clearly contemplate the principle of temporary relocation. See RHA 7212.1, Ch. 2, Sec. 1, at 2. As was explained in Note, "Family Relocation in Urban Renewal," 82 Harv.L.Rev. 864, 885 (1969):

> "Sometimes redevelopment occurs slowly enough that all residents are able to move into other housing before demolition begins. However, when demolition is scheduled for the near future, and standard units still cannot be found, the LPA will have to move the remaining families into temporary housing. Although the temporary units need not be standard, HUD requires that they be in a 'safe and habitable' condition and at least as desirable as the previous housing * * * HUD seems to have had unfortunate experiences in the past with LPA's that moved families into this substandard temporary housing and thereafter ignored them. It is now trying to prevent the use of temporary housing as a permanent resource by ensuring that, if possible, the units are onsite or otherwise of a definitely temporary nature."

In this regard, even plaintiffs cannot quarrel with the proposition that the Seward Park site, which is itself scheduled for clearance, is "of a definitely temporary nature." In addition, whereas here only four residential families or individuals (by plaintiffs' own count) remain on the Washington Street renewal site out of an original 58 such tenants according to defendants' latest survey (or out of an original 11 according to an earlier count by plaintiffs), common sense and equity would normally dictate the use of temporary relocation facilities in preference to a stoppage of progress in a program of general benefit to an entire community. (The reasons why I deem temporary action inappropriate and unnecessary at the present time in the instant case, however, will be discussed *infra*.) In any event, the court is not here faced with a factual situation such as confronted the courts in *Norwalk CORE* and *Western Addition*, *supra*, where the feasibility and legality of entire relocation plans (and not merely the temporary relocation of a small number of individuals) were subjected to challenge on a mass scale. To delay hundreds of families in their quest for decent new housing on the basis of several individuals' dissatisfaction with a temporary relocation offer would only serve to thwart the very congressional intention underlying the Housing Act.

In light of the above discussion, I find that plaintiffs have not established the likelihood of their succeeding on the merits of their relocation claims, and accordingly that portion of plaintiffs' request for preliminary relief which seeks to enjoin further demolition or eviction until such time as defendants "have undertaken appropriate and lawful steps for relocating plaintiffs" is denied.

### III.

Plaintiffs next challenge the propriety of continued federal funding on the ground that defendants have not advanced construction plans for the Wash-

ington Street renewal site beyond the preliminary stage in nearly ten years and have therefore failed to offer a "workable program for community improvement" as required by 42 U.S.C. § 1451(c). Plaintiffs, however, have misconceived the function of the workable program requirement.

Section 1451(c) provides in substance that no contracts for loans or grants shall be entered into by HUD unless (1) the locality presents to the Secretary a "workable program for community improvement" (including a plan for effectively dealing with slums and blight areas within the community and for establishing and preserving a well-planned community with well-organized residential neighborhoods of decent homes and suitable living environment for adequate family life), (2) the Secretary determines that such program meets the requirements of the section just summarized, and (3) the Secretary certifies that federal assistance may be made available in the particular community.

■ Clearly the "workable program" requirement applies not to any particular renewal project, but to the community (in this case, New York City) as a whole. See *Western Addition, supra,* 294 F.Supp. 433, at 445. Once this program is accepted by the Secretary, federal funding of individual projects within that total community may then begin. In the instant case, a workable program was submitted by New York City and approved by HUD in July 1959. This program was recertified in April 1963 and in May 1964. As for the Washington Street Urban Renewal Project itself, it had been approved by HUD in March of 1963.

It is plaintiffs' implicit contention that the workable program here in question has lapsed by virtue of the government's acknowledged failure to recertify it prior to its last annual expiration date, and that there is, therefore, no workable program in effect at the present time of which the Washington Street project is a part.

■ However, while it is true that a workable program must be recertified periodically after the date of its original acceptance and that the effect of a government failure to recertify a program prior to the date of its expiration is to prevent federal financing of individual projects proposed *after* that date, such a lapse does not affect the financing of renewal projects within the community for which loans or grants had been executed *prior* to the expiration date. See *Western Addition, supra,* at 445. As noted above, the present project was approved in March 1963, well before the expiration of the workable program of which it was a part.

As to plaintiffs' claim of stalled progress on this particular project, it does not appear properly maintainable under the "workable program" section of the Act, which is intended not to provide a watchdog over the construction timetables of individual projects, but to prescribe general guidelines for an overall community plan of action.

Finally, plaintiffs contend that in light of the vague and uncertain status of defendants' present construction plans for the Washington Street site, it would be inequitable and contrary to the declared policy of the Housing Act to permit the immediate demolition of presently habitable dwellings during a period of housing crisis in the City of New York.

Defendants, however, dispute the factual premise of plaintiffs' argument and assert that the City "is ready, willing and able to proceed forthwith with the physical alteration of the Washington Street Urban Renewal Area." (Affidavit of Marion Petersen, coordinator for the Office of Community Development of HDA, dated June 15, 1970, at p. 3). Defendants maintain that they have obtained or will obtain in the immediate future all necessary authorization from the appropriate governmental bodies to go forward with the Washington Street project. However, it appears to the court at this time that defendants' own affidavits refute the validity of these contentions.

The project in issue came into being over eight years ago. Five years ago all the property within the renewal site was condemned and title vested in the City. As far back as December 24, 1968, an attorney for the City affirmed that "it has completed all the plans in connection with this project, and is now ready to go forth with no delay for the completion of the same." (Complaint, Count 1, p. 3). Yet, even at this late date, no final plans have been approved for construction on the project site and there has, of course, been no construction begun thereon as of this time.

Two separate projects have been planned for the Washington Street site. One is to be privately financed by the Lefrak Organization, Inc., and the other, Mitchell-Lama Housing, is to be financed by the City itself. To date, Lefrak has proffered no final building plans for the site and indeed has made no provision for the financing of the project. Similarly, although preliminary plans for the development of 1335 Mitchell-Lama financed housing units have been approved by the Office of Housing and Facilities Production (the City agency responsible for the production of the Mitchell-Lama housing), the City has not as of this date obtained the necessary approval of its project from the New York City Board of Estimate.

In this regard defendants' affidavits are not only uninformative and unconvincing, but are replete with self-contradictions. For example, the affidavit of David S. Olinger, Deputy Commissioner of the Office of Community Development, HDA, dated April 27, 1970, states that the Mitchell-Lama brochure and disposition documents were to be presented to the Board of Estimate at its June 18, 1970 meeting. On the other hand, the June 15, 1970 affidavit of Marion Petersen indicates that the Mitchell-Lama plans were to have been submitted to the Board for approval in July or August. The Petersen affidavit also suggests as a strong possibility that the Lefrak Organization may soon withdraw as a major sponsor of the project,

in which case a new sponsor would have to be chosen.

One further critical point regarding the expected start of site construction must be discussed. It is generally conceded that a condition precedent to the initiation of any construction on the Mitchell-Lama project site is the re-routing of utility conduits from their present location in the roadbed of Washington Street to Greenwich Street. It is also agreed that the approved Urban Renewal Plan calls for the widening of Greenwich Street to accommodate these re-routed utilities. However, while it is undisputed that 360 Greenwich Street is situated on the site where Mitchell-Lama housing is to be constructed and that the structure located at that address stands on the proposed widened sidewalk under which the new utility lines are to be placed, one crucial factor has been overlooked by the City authorities: the Board of Estimate of the City of New York has to date failed to authorize the widening of Greenwich Street, a necessary prerequisite to the start of any such re-routing. (Complaint, Count 1, para. 16; Affirmation of Jeffrey G. Stark, dated June 8, 1970, paras. 7-9; Petersen Affidavit, *supra*, at p. 2). The latest information presented to the court on this subject is that the Director of the Budget has as yet not even submitted his report on the proposed widening of Greenwich Street to the Board of Estimate for its ultimate consideration and approval. It was undoubtedly this present sad state of affairs in the now ten-year history of the Washington Street project which prompted one City administrator to predict (perhaps too optimistically even) that construction will commence no earlier than the spring of 1971. (Affidavit of Marion Petersen, *supra*, p. 1).

The City chooses to ignore its own role in preventing the start of preliminary utility line construction and instead seeks to lay the blame for delay at the doorstep of the allegedly uncooperative plaintiffs. Defendants attribute this delay to plaintiffs, and contend that

it has added incalculably to the costs of the project in this period of continuously rising construction prices. (Affidavit of Louis Wexler, dated June 22, 1970, paras. 4, 13.) Such charges, however, cannot obscure the clear fact that the City's own tardiness, and not plaintiffs' intransigence, has been primarily responsible for the unduly delayed start of construction on the Washington Street site. The City itself holds the key to its urban renewal success or failure.

■ Simply put, the City has failed to make any showing, let alone an adequate showing, that present construction plans require the immediate demolition of the premises in question. While the court does not "doubt the necessity of discretionary decision making in urban renewal planning," *Norwalk CORE, supra,* 395 F.2d at 929, it also believes that area residents should not be "left for all practical purposes to the pleasure of the local agency and of the federal financing agency as to when, how and under what conditions they can be involuntarily displaced or threatened with such displacement." *Western Addition, supra,* 294 F.Supp. at 441. Thus, although the local agency must be given reasonable discretion in the execution of its timetable of clearance and development, it cannot be endowed with arbitrary and indiscriminate power to evict and demolish.

■ This court will not blind itself to the continuing contraction in the already pitifully small market of habitable dwellings available to low-income tenants. Judicial notice must be taken, for example, of the severe drop in the rental vacancy rate in New York City from 3.2 per cent in 1965 to 1.2 per cent in 1968. Rental Housing in NYC, The NYC Rand Institute, p. v.

■ The relocation requirements of the Act, and indeed the entire thrust of the housing statute itself, were designed to guarantee "that, in clearing slum areas, government would not be driving into still worse conditions the people who lived in those areas." *Norwalk CORE, supra,* at 395 F.2d 933–934. It follows as a necessary corollary of this relocation principle that such persons should not be driven out of these areas at all until such time as the local agency has reasonably and adequately shown good cause therefor. The legislative history of the Act suggests that it was Congress' intention to "set up adequate safeguards against *any undue hardship* resulting from the undertaking of slum clearance." *Norwalk CORE, supra,* at 933 (emphasis added). Until such time as the HDA can make a good faith showing that it is actually ready, willing, and able to proceed with construction of the project, eviction of plaintiffs herein and the resulting demolition of their otherwise habitable dwellings would constitute not only an undue but an unnecessary hardship. To force these plaintiffs prematurely and unnecessarily into temporary quarters in Seward Park or elsewhere might not only prejudicially affect their individual livelihoods but would also further contract income housing in the City.

It was obviously such a fear that the already too precious supply of low-prompted the legislature to express its deep concern for post-demolition delays in construction within the language of the Act itself. See, e. g., 42 U.S.C. 1455(b) (ii), which provides, in part, that

"When real property acquired or held by the local public agency in connection with the project is sold or leased, the purchasers or lessees and their assignees shall be obligated * * * to begin *within a reasonable time* any improvements on such property required by the urban renewal plan * * *." (Emphasis added.)

Section 1452(d) (2) also prohibits the Secretary from entering into any contract for advances for the preparation of a General Neighborhood Renewal Plan public agency proposes to undertake without first determining that "the local *promptly* an urban renewal project embracing at least 10 per centum of such area * * *." (Emphasis added.) The amended Urban Renewal Plan for the

Washington Street site itself requires that redevelopers begin and complete development "within a reasonable time."

Quite clearly, then, the Congress intended to infuse the statute with minimum standards of promptness applicable not only to private developers but to local public agencies as well.[1]

 Finally, it must be noted that where there exists an "imbalance of hardship," as here, the grant of a preliminary injunction does not depend on a holding that plaintiffs demonstrate the "probability" of success normally required for the granting of preliminary relief; it is sufficient if plaintiffs raise, as they have here, "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." Semmes Motors, Inc. v. Ford Motor Company, 429 F.2d 1197, 1205–1206 (2d Cir., decided July 6, 1970).

Accordingly, plaintiffs' prayer for preliminary relief is granted to the extent of enjoining defendants from proceeding with the demolition of the premises at 360 Greenwich Street and 179 West Street, or the eviction of plaintiffs therefrom, until such time as projects planned for the renewal site encompassing said premises have been authorized by all appropriate governmental bodies and until such time as sponsors for said projects have adequately demonstrated their readiness, ability and willingness to proceed forthwith with the development of the renewal site. Upon a good faith showing of compliance with the above stated conditions, defendants may apply to this court at any time to dissolve the aforesaid injunction.

Defendant City's motion for summary judgment is presently denied without prejudice to renewal upon a similar demonstration of reasonable and adequate compliance with the criteria enunciated above.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Settle order on notice.

---

1. The court is also mindful of the recent order of the New York State Supreme Court, dated May 23, 1970, granting the motion of the tenants of 204 Franklin Street, a commercial building within the project site, to stay eviction therefrom until at least September 1, 1970. In that case Justice Hyman Korn granted the motion for a stay of eviction notwithstanding the City's claim that such a stay would delay the start of major utility relocation in the project area.