Harry T. Nttsbattm, J.
The plaintiff in this action seeks to recover the value of personal property allegedly unlawfully removed or stolen from an apartment in which they were placed by the plaintiff tenant under the direction of the City Urban Renewal Management Company.
The question presented is whether from the facts proved a bailment resulted which placed upon the city or its employees the duty to exercise reasonable care for the safety of the tenant’s property and whether the city breached that duty.
The testimony adduced at the trial established the following facts: The City of New York in its zeal to demolish the prem *862 ises in which the plaintiff tenant resided at 360 Q-reenwich Street, New York City, notified the tenant he must forthwith move his furniture and belongings to Apartment 3A at 55 Suffolk Street under the threat that if he did not move his property, it would be seized by the Sheriff. The testimony further reveals that the tenant protested this precipitous move both because he was about to go on vacation and because the apartment at 55 Suffolk Street was not ready for occupancy. Nevertheless, he acquiesced to the city’s demand .some days later and proceeded to move to the emergency housing provided for him at 55 Suffolk Street under the city’s .relocation procedures.. There he found there was no key available for the apartment and no one present to give him access. As the moving van and moving men were waiting in the street, the plaintiff with the consent of a person holding himself out to be the' superintendent engaged the services of a locksmith who removed and replaced the old lock. Following the defendant’s instructions he placed' his belongings in one room to facilitate the painting and other repairs required to make the apartment habitable and locked the door, .retaining one of the new keys for himself and turning over the other key to the person representing himself to be a Mr. J oseph Fuller, the superintendent.
When he returned from his vacation, he found the door swinging open and most of his belongings gone. The city through its witnesses denies that it received the key and states that it was unable to do the painting and other necessary repairs because it could not gain access to the apartment, although admitting that it twice found the door open which necessitated it being nailed shut. The person who held himself out to be the superintendent, Mr. Fuller, turned out to be his assistant, a Mr. MacLain.
As the trier of the facts, I found the witnesses presented by the city entirely unworthy of belief, and credit completely the facts as related by the plaintiff.
The City Urban Renewal Management Company, as the agent of the City of New York, by forcing the plaintiff- to relocate and remove his belongings to the apartment at 55 Suffolk Street which was not ready for occupancy, became the bailee of the plaintiff’s personal property during the period required to make the apartment habitable. As such bailee, it was under a duty to exercise at least ordinary or reasonable care in safeguarding that property.
The intent of Congress to protect citizens from the dangers inherent in the mass removals and relocations which are the unfortunate by-products of housing rehabilitation and slum *863 clearance is plainly manifest in subdivision (c) of section 101 and subdivision (c) of section 105 of the Housing Act of 1949 (U. S. Code, tit. 42, § 1451, subd. [c]; § 1455, subd. [c], pars. [1], [2]). As .the court indicated in Talbot v. Romney (321 F. Supp. 458, 463) the Congressional plan was to provide “ decent, safe and sanitary dwellings ” for each individual and family displaced from urban renewal areas. To this end, the cities participating in the plan were charged with formulating plans which would assure that the relocations required would meet the standards imposed by the statute.
In the case at bar the city’s attempted relocation of the plaintiff in an apartment not meeting the statutory requirements violated the intent of. the statute and placed the plaintiff in the position of being forced to store his belongings with the city during the period the apartment was being made habitable.
The fact that the plaintiff would eventually take possession of the premises as a tenant is not controlling. At the time the property was stored in the apartment it was not ready for occupancy and exclusive dominion and control of the apartment had not been turned over to him. The relationship of landlord and tenant had not as yet come into being and in fact could not until the apartment complied with the statutory standard of a ‘1 decent, safe and sanitary dwelling.” (Talbot v. Romney, supra; Dalton v. Hamilton Hotel Operating Co., 242 N. Y. 481).
To determine whether a bailment has been established, the test to be applied is whether or not the person leaving the property has made such a delivery as to amount to a relinquishment of his exclusive possession, control and dominion thereof, and vested such control and dominion in the person upon whose premises the property has been left. (Osborn v. Cline, 263 N. Y. 434; 5 N. Y. Jur., Bailment, § 22.)
I find from the evidence that the transaction as related by the plaintiff resulted in a relinquishment of possession and control and that a bailment resulted. Whether the bailment which resulted was a mutual benefit bailment or a gratuitous bailment or a bailment for the exclusive benefit of the city is of no importance in this case. The evidence adduced during the trial clearly indicates that the city did not use reasonable safeguards to protect the plaintiff’s property and in fact could be found to have been grossly negligent in its care of the plaintiff’s belongings (Dalton v. Hamilton Hotel Operating Co., supra).
Judgment is therefore awarded to the plaintiff for the sum of $2,400, plus interest.