**MOORE–McCORMACK LINES, INC., Plaintiff,**

v.

**INTERNATIONAL TERMINAL OPERATING COMPANY, INC., Defendant.**

**No. 80 Civ. 4349 (CLB).**

United States District Court, S.D. New York.

Oct. 16, 1985.

Vincent J. Barra, Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for plaintiff.

Vincent J. Ryan, William T. Curran, Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for defendant.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

The Plaintiff, Moore-McCormack Lines, Inc. ("MORMAC"), filed a claim in indemnity against defendant, International Terminal Operating Company, Inc. ("I.T.O."). MORMAC, an ocean carrier, seeks to recover for amounts it paid to cargo claimants as reimbursement for the loss or non-delivery of various goods at the 23rd Street Terminal in Brooklyn, New York. By consent, pursuant to 28 U.S.C. § 636(c), and after representing to this Court that the case involved a factual dispute only, the parties tried the case before Hon. Joel J. Tyler, United States Magistrate, on November 15–16, 1982. The parties agreed to take any appeal to this court in accordance with 28 U.S.C. § 636(c)(4).

In an opinion dated December 13, 1984 Magistrate Tyler dismissed MORMAC's complaint on the merits.* He found that MORMAC had failed to satisfy its burdens of proof on its contract and negligence claims under New York State law. The familiarity of the reader with the opinion of the Magistrate is assumed.

* See appendix.

Although we reach that result by a different route, we find that Magistrate Tyler's ultimate conclusion holding I.T.O. not liable to MORMAC was correct. The learned Magistrate ruled that MORMAC's claims did not arise within our admiralty and maritime jurisdiction, and resolved the issue between the parties in accordance with New York law, based on his analysis of the evidence.

The contract at issue does relate entirely to a maritime subject, however, and this Court on review concludes that the claims arising under it should have been adjudicated within our admiralty and maritime jurisdiction, rather than as pendent claims arising under state law. Even with the benefit of federal law, we find that MORMAC has failed to satisfy its burden of proof with respect to its claims.

MORMAC asserted its claims against I.T.O. under a contract entered into on October 1, 1976. By that contract I.T.O. agreed to act as a stevedore and terminal operator at the 23rd Street Terminal in Brooklyn. I.T.O. agreed to load and discharge cargoes for MORMAC's vessels, as well as other ocean vessels and lighters, and to receive and deliver those cargoes. MORMAC leases the terminal or pier from the City of New York and owns all the appurtenances. I.T.O. employees perform all the customary terminal operating and stevedoring functions. However, MORMAC furnishes the guards and maintains all security at the premises. Pursuant to the contract, I.T.O. employs all longshoremen, and does the tally. After discharge, I.T.O. sorts and stacks the shipments in a shed on the pier, awaiting delivery to the consignees' truckmen or lighterage. I.T.O. also places outbound cargo in this shed after it receives it from a shipper; then it prepares the cargo for shipping and loads it on board the appropriate vessel. That confusion, misdelivery, non-delivery and pilferage would result from this activity is hardly surprising.

In this action MORMAC alleges that I.T.O. is responsible for the loss of eight separate items of cargo, seven "incoming" shipments which it discharged, and one "outgoing" shipment it had the responsibility to load aboard a MORMAC vessel. MORMAC had previously compensated the shippers and/or consignees for these losses or shortages. At trial Magistrate Tyler found as a fact that the goods were lost after discharge in the case of the incoming items, and prior to loading in the case of the lost outbound goods. In making this determination he relied upon the "sort sheet," upon which I.T.O. accounted for the receipt of the cargo. This record showed that I.T.O. had unloaded and received each of the seven incoming shipments and had received the full complement of outbound items to be loaded.

Magistrate Tyler also determined that the contract was separable into two agreements; first, a stevedoring contract, and second, a terminal operating contract. Opinion at 1420. He held that the former was a maritime contract, but that the latter was not. Having found that the cargo was lost during the course of performance under the non-maritime portion of the contract, the Magistrate declined to exercise admiralty and maritime subject matter jurisdiction. Instead, he regarded the claims as arising under New York law and within our pendent jurisdiction.

*Subject Matter Jurisdiction*

The traditional test of admiralty jurisdiction in contract cases derives from the decision of Justice Story on circuit in *DeLovio v. Boit,* 7 F.Cas. No. 3,776 p. 418 (C.C.D. Mass.1815). The Supreme Court has stated this test as follows:

"While the civil jurisdiction of the admiralty in matters of tort depends upon locality—whether the act was committed upon navigable waters—in matters of contract it depends upon the subject matter—the nature and character of the contract ... as to whether it have reference to maritime service or maritime transactions." *North Pacific S.S. Co. v. Hall Bros. Co.,* 249 U.S. 119, 125, 39 S.Ct. 221, 222, 63 L.Ed. 510 (1919).

Where contracts are mixed and involve distinct subjects, there is authority to the effect that they should be separated, so that the court may consider only the maritime aspect within its admiralty jurisdic-

tion. *Berwind-White Coal Mining Co. v. City of New York,* 135 F.2d 443, 447 (2d Cir.1943). In this instance, however, the entire contract is maritime and should have been considered within our admiralty and maritime jurisdiction.

It is undisputed that stevedoring is a maritime activity and that such contracts are maritime contracts. *American Stevedores v. Porello,* 330 U.S. 446, 456, 67 S.Ct. 847, 852, 91 L.Ed. 1011 (1947). I.T.O. claimed, and Magistrate Tyler found, that the maritime commerce concluded once the stevedores had completed unloading the cargo. The terminal services and delivery that followed were considered non-maritime functions. Magistrate Tyler separated the contract because MORMAC's contract administrator testified that the stevedoring and terminal services provisions are "pretty much distinct and apart" with "two separate and distinct rates in the agreement, Exhibit 3, one for stevedoring and one for terminal operators." Opinion at 1420. The Magistrate further found that the terminal services portion was essentially a storage contract, relying on a long line of cases which hold that storage contracts are not maritime, *e.g., Colgate Palmolive Company v. S.S. Dart Canada,* 724 F.2d 313 (2d Cir.1983), *cert. denied,* 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984).

The nature and character of the I.T.O.—MORMAC contract is not for storage. I.T.O.'s duties include the following functions traditionally performed by or for an ocean carrier of goods: To supply clerical personnel to record delivery and receipt of cargo; to sort and stack cargo; to make repairs to cooperage, rebag goods, etc.; to receive and tier outbound cargo; to break down cargo according to lot designations; to load and unload trucks and harborcraft; and to perform cleaning and general housekeeping on the piers. (A455–459). The storage that does occur under the contract is incident to the performance of the numerous maritime services undertaken for the ocean carrier by I.T.O. On any pier, outbound goods are likely to arrive before the vessel commences to lift cargo, and inbound goods often await action by the consignees or notify-parties. Usually the latter must receive notice of arrival, obtain the bill of lading through banking channels, and arrange for trucking and customs clearance before the goods may be called for and removed from the pier.

■ When, as in this case, the element of storage is merely incident to a maritime contract, the entire contract is maritime. *Pillsbury Flour Mills Company v. Interlake S.S. Company,* 40 F.2d 439, 440 (2d Cir.1930); *Marubeni-Iida (American), Inc. v. Nippon Yusen Kaisha,* 207 F.Supp. 418, 419 (S.D.N.Y.1962).

That the Magistrate found that the losses occurred during the storage of the cargo, *i.e.* after discharge and before delivery to the consignee, or prior to loading, for the outbound shipments, is essentially irrelevant. As a claim for breach of contract the jurisdictional inquiry begins and ends with the subject matter of the contract. The references to cases such as *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800 (2d Cir.1971); *Colgate Palmolive Co. v. S.S. Dart Canada,* 724 F.2d 313 (2d Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984); and *Minemet Inc. v. M.V. Mormacdraco,* 536 F.Supp. 769 (S.D.N.Y.), *aff'd.,* 714 F.2d 115 (2d Cir. 1982) are inapposite. None of these cases concerned a breach of contract claim between a carrier and its stevedore/terminal operator. All considered claims for negligence by a shipper or consignee against the terminal operator after the court held that the shipper had no contractual claim against the terminal operator under the bill of lading or contract of affreightment. Consequently, those courts were obliged to consider the claims under the relevant state law and within the federal court's pendent or diversity jurisdiction.

The recognition of the claim pleaded here as within our admiralty and maritime jurisdiction is consistent with our longstanding tradition and policy favoring the preservation of our constitutional admiralty and maritime jurisdiction, exemplified by the works of Justice Story.[1] It is also consist-

---

1. "It was said of the late Justice Story, that if a bucket of water were brought into his court

ent with the principle that jurisdiction should be tailored to its purpose by "dealing with the major concerns of the shipping industry—with all of them, and not just with a few of them selected on antiquarian criteria." G. Gilmore and C. Black, Admiralty, 29 (2d Ed.1975). The loss of maritime cargo either in the course of loading and unloading or in the midst of preparing it for delivery at pier-side, is such a major concern of the shipping industry.

This Court concludes that the claims pleaded here shall be resolved as admiralty and maritime litigation, without regard to state law.

*Implied Warranty of Workmanlike Service*

MORMAC asserts that the parties enjoy the benefit of an implied warranty of workmanlike service in the contract, and that in any event, absent a disclaimer, such an implied warranty exists as a matter of law. The Memorandum of Agreement between the parties sued on here specifies that: "The contractor (I.T.O.) will perform as provided for specifically herein the duties functions and services customarily performed by a terminal operator and stevedore." (A–455). I.T.O. also specifically agreed therein to "[a]ccomplish the efficient receipt of cargo onto the pier and delivery from the pier...." (A–456). Memorandum of Agreement, ¶ 2(b). These provisions are said to give rise to an implied warranty. MORMAC's contract administrator testified that he intentionally excluded from the contract, language found in the prior 1968 contract between the parties, which had disclaimed any implied warranties. Based on this testimony, Magistrate Tyler correctly found that "MORMAC disclaimed none of the usual implied warranties that may be legally inherent under such contract ... [and] that I.T.O. understood such meaning." Opinion at 1410.

The Magistrate refused, however, to imply a warranty of workmanlike service with regard to the terminal services portion of the contract. He determined that this warranty was applicable only in cases regulated by federal maritime law. Because he had found that he could consider only the state claims against I.T.O. he did not reach the issue of breach of warranty. As this is a maritime contract within this court's admiralty and maritime jurisdiction, we consider this claim in full.

The Supreme Court first implied the warranty of workmanlike service to permit shipowners to secure indemnity from stevedores for payments made by the shipowners to longshoremen for injuries sustained in the course of cargo handling activities performed on a vessel. *Ryan Stevedoring Co. v. Pan Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). Under this implied warranty a court may infer that a breach of warranty by the employer caused such injury to a longshoreman. *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964). The same rule extends to loss or damage to cargo in the stevedore's possession. *Stein Hall & Co., Inc. v. S.S. Concordia Viking*, 494 F.2d 287 (2d Cir. 1974).

Our Court of Appeals extended the warranty to misdelivered cargo by a stevedore/terminal operator in *David Crystal, Inc. v. Cunard Steamship Co., Ltd.*, 339 F.2d 295, 300, 302 (2d Cir.1964). The misdelivery occurred in that case when the terminal operator tendered the goods to a third party on the basis of a forged claim ticket. The court applied the warranty when the shipping company failed to show any negligence on the part of the stevedore/terminal operator. The court reasoned that the stevedore/terminal operator "was in a far better position to prevent the misdelivery than Cunard [the shipping company] and liability should properly fall upon the party who is best situated to adopt protective measures." *Id.* at 299.

In *Stein Hall*, the warranty of workmanlike service was implied where the stevedore had simply been unable to account to

with a corn cob floating in it, he would at once extend the admiralty jurisdiction of the United States over it." Note, 37 Am.L.Rev. 911, 916 (1903).

the carrier for the loss of cargo, although there was no evidence of negligence. The court in *Stein Hall* stated that the stevedore/terminal operator, Pittston,

> "was liable for the loss on either of two grounds. First under the stevedoring contract, Pittston gave an implied warranty of workmanlike service competently to perform the carrier's statutory and contractual obligations for the discharge of the cargo. [Citations omitted]. Second, once Pittston as the terminal operator took possession of the cargo, it became a bailee for the mutual benefit of the carrier and the consignees." *Stein Hall*, 494 F.2d at 290.

I.T.O. argues that this aspect of the warranty has been extended only to the actual stevedoring function of loading and discharging the vessel. Under its view, the warranty was satisfied in this case when Magistrate Tyler found that I.T.O. had placed all of the discharged cargo on the pier. MORMAC argues in response that the court in *Stein Hall* did not intend to limit the scope of the warranty simply to loading and discharging vessels, and the defendant, as terminal operator, should also be held liable under the implied warranty. We accept this argument as valid.

However, whether viewed on a contract theory of breach of an implied warranty, or whether resolved in terms of bailment, or negligence, the lesson of *Stein Hall* and *David Crystal* is that the party with complete control of the goods must explain the loss or damage to cargo. In the present case, I.T.O. was essentially an independent contractor supplying specified services to MORMAC at the 23rd Street Terminal. As such, it did not have the requisite control and responsibility for the cargo so that a breach of the warranty of workmanlike service could be inferred merely from mysterious disappearance. I.T.O. had the responsibility to move and prepare cargo for loading and unloading. Consequently, it could be held liable, without proof of its negligence, for any damage to the goods or for its failure to perform its duties properly while so engaged. In *David Crystal*, for example, the plaintiffs established that the terminal operator had

in fact delivered the missing goods to a thief (who had presented the forged claim check).

I.T.O. did not undertake, however, by implication or by express contract, to act as the insurer for the cargo at the 23rd Street Terminal. MORMAC, as the lessee of the terminal, and the owner of the pier-side shed, provided the security arrangements and guards. Customarily at the end of the workday, I.T.O. was not present on the pier.

It follows in logic that where it is equally likely, because of an absence of direct evidence, that any particular lost goods were removed from the pier or shed by unauthorized persons acting after or during business hours because of a breach or failure of security on the part of MORMAC, as it is likely that those goods were misdelivered by I.T.O., plaintiff cannot prevail on the theory of breach of warranty. Where a specific reason for a loss appears in a given case, and that reason involves a breach of the implied warranty on the part of I.T.O., the result would be otherwise.

For want of evidence of a breach of the warranty, and because a mysterious disappearance standing alone does not prove such a breach, judgment must be for I.T.O. on this theory.

### Bailment

Magistrate Tyler determined that the agreement between the parties did not create a bailment because the agreement had not left I.T.O. with the requisite exclusive control of the goods. He consequently concluded that he could not find liability on I.T.O.'s part for breach of the terms of the bailment based only on the fact that I.T.O. had failed to deliver all of the goods it had received.

MORMAC has failed to demonstrate that this conclusion is clearly erroneous, and this Court agrees there was no bailment. As noted above in the discussion relating to the Implied Warranty of Workmanlike Service, MORMAC owned the terminal, provided the security forces and supervised many of I.T.O.'s activities. As

Magistrate Tyler observed, I.T.O. personnel work at the 23rd Street Terminal between 9:00 A.M. and 5:00 P.M., although they occasionally work overtime into the evening hours. The terminal, however, remains open twenty-four hours and when the I.T.O. employees leave at the end of their day, MORMAC employees stay behind. They remain stationed at the pier "round the clock." I.T.O.'s responsibilities as a contractor for labor services do not satisfy the exclusive possession requirement for a bailment.

Some courts have found that bailments existed between shipping companies and the terminal operator, but those cases are distinguishable on their facts. In *Stein Hall*, for example, the court found such a bailor-bailee relationship. In that case the shipping company had no obligations or duties with respect to the terminal operations and the pier, leaving the terminal operator with the exclusive control of the shipments consistent with a bailment. Other cases have held that the terminal operator, as an agent of the ocean carrier, is a bailee of cargo it had a duty to load or discharge in its relationship with a shipper or consignee. *See, e.g., Leather's Best, Inc. v. S.S. Mormaclynx, supra,* 451 F.2d at 812. In this case, this court need not determine whether I.T.O., as a principal, or as an agent for the carrier, was a bailee with respect to the shippers or consignee of the goods in storage. We simply agree with Magistrate Tyler that, under this contract, no bailment existed between MORMAC and I.T.O. because, at least as between them, I.T.O. never had exclusive control.

*Negligence or Breach of Contract*

█ It is true that I.T.O. "agreed to assume full responsibility for misloading or failure to load cargo ... or in cross-delivery of cargo." Opinion at 7. MORMAC has failed to establish or present, by direct proof of misloading or misdelivery, a *prima facie* case that I.T.O. breached this agreement or acted negligently. *See*

*David Crystal, Inc. v. Cunard Steamship Co., supra,* 339 F.2d 295. It has proved only that I.T.O. received or discharged the cargo and that the consignees or vessels did not receive it.

It is conceded that the cargo did not just walk away on its own. Some irregularity must have occurred. MORMAC's assertions, however, that only misdelivery or misloading by I.T.O. could explain the losses are unsubstantiated. It is just as likely that someone perpetrated a theft of the cargo during the nighttime when I.T.O. had no control of the pier and no obligations to the cargo. MORMAC has consequently failed to prove a *prima facie* case of negligence, malfeasance or breach of contract necessary to sustain its claim on the above theories.

*Conclusion*

The result reached in this case by the Magistrate is affirmed. The Clerk shall enter an appropriate final judgment or order of affirmance.

So Ordered.

APPENDIX

OPINION

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

JOEL J. TYLER, United States Magistrate:

Essentially, we are faced with the claims of the plaintiff, Moore-McCormack Lines, Inc., ("Mormac"), for indemnification, to recover sums paid by it to cargo consignees (and a shipper as to one claim) as reimbursement for loss of portions of cargo claimed lost while in the alleged custody and control of defendant, International Terminal Operating Company, Inc. ("ITO") at the 23rd Street Terminal located in Brooklyn, New York. The conflict, which resulted by ITO's rejection of the claims, prompted this action and the resultant trial, held before this court on November 15, 16 and 23, 1982.[1] Pursuant to 28 U.S.C. § 636(c),

---

1. Full submission of briefs were not made until April 19, 1984 and attachments to Mormac's trial exhibit "3" (the agreement between the parties herein) were not submitted until received on November 26, 1984, although requested by this court's letters, dated February 7 and October 29, 1984.

the parties waived their right to proceed before a judge of the United States District Court and consented to trial before a United States Magistrate. Accordingly, Judge Charles L. Brieant, to whom the case is assigned, referred the matter to the undersigned for trial by order, dated May 21, 1982.

The following constitutes this Court's Findings of Fact and Conclusions of Law following trial and after hearing argument of counsel, pursuant to Rule 52(a), Fed.R. Civ.P..

## THE COMPLAINT

### A. *Diversity*

The complaint here involved is the Second Amended Complaint ("the Complaint"). It alleges admiralty jurisdiction within the meaning of Rule 9(h), Fed.R.Civ.P.. It does not allege admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) or upon any other basis, save Rule 9(h). We agree with ITO that "[t]here has been no allegation or proof of diversity jurisdiction." (ITO's Post-Trial Memo, at 10), and, thus, we find none, *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 [56 S.Ct. 780, 785, 80 L.Ed. 1135] (1936) (Jurisdiction must be alleged and if challenged, established by "competent proof"); *United States v. Montreal Trust Company*, 358 F.2d 239, 245 n. 2 (2d Cir.), *cert. denied*, 384 U.S. 919, *reh'g denied*, 384 U.S. 982 [86 S.Ct. 1366, 16 L.Ed.2d 440] (1966); *Trinanes v. Schulte*, 311 F.Supp. 812, 813 (S.D.N.Y.1970), given, in any event, our *sua sponte* responsibilities to note jurisdictional defects, *McLearn v. Cowen & Co.*, 660 F.2d 845, 848–49 (2d Cir.1981); *United States v. Town of North Hempstead*, 610 F.2d 1025, 1029 (2d Cir.1979); *Bernstein v. Universal Pictures, Inc.*, 517 F.2d 976, 979 (2d Cir.1975), and our mandated obligation under Rule 12(h)(3), Fed.R.Civ.P.[2]

### B. *The Claims*

#### (a) First Cause of Action—Breach of Contract

Mormac alleges that:

1. ITO, at all relevant times, was and is "a stevedore and terminal operator" and agreed (under contract) "to perform stevedoring and terminal services" (Complaint, ¶¶ 6, 7).

2. As a stevedore and terminal operator, ITO "received, accepted and agreed to properly store and load" outgoing cargo onto and into Mormac's vessels and, as to incoming cargo, it agreed to unload cargo from Mormac's vessels and to store the same to await delivery to proper consignees. (Complaint, ¶¶ 5–7).

3. The cargos in question were received and accepted by ITO, but portions thereof were "lost and/or otherwise damaged", in amounts delineated in Schedule "A", attached to the Complaint, and while the same were in ITO's "complete control". Because of such loss (or damage), ITO breached the agreement between the parties, which Mormac fully performed. (Complaint, ¶¶ 7–9, 11).

4. Mormac seeks indemnification for payments made by it to claimant-consignees (and a shipper), for whom it acts as "agent and trustee". (Complaint, ¶ 11).

#### (b) Second Cause of Action—Breach of Warranty

Mormac repeats all of the prior allegations in the first cause of action, and further alleges, as a separate cause of action, that ITO warranted, expressly and impliedly, that it would perform its work "in a safe and proper manner", but failed to do so. (Complaint, ¶¶ 13–16).

Said Exhibit "A", lists the type of shipments allegedly received by ITO, the ships upon which they arrived or were exported, the amount of shortage ITO failed to deliver, the names of the consignees and the respective values of the shortages. Eight shipments are involved; seven were inbound cargo and one was an outbound cargo.

Given the liberal pleading requirements in admiralty cases and our instruction that

---

**2.** ITO raised the question of subject matter jurisdiction, for the first time, in its Post-Trial Memo., at 3–12, which we shall deal with later.

Of course, that question could be raised at any time.

such pleadings be read with liberalty, *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 808 (2d Cir.1971); *Doris Trading Corp. v. SS Union Enterprise,* 406 F.Supp. 1093, 1096 (S.D.N.Y.1976), Mormac did not, nor was it required to indicate in the complaint, specifically, where and at what point in the operation the losses occurred, whether during the stevedoring operation or during storing or other terminal operations. No pre-trial motions were made by either side for summary judgment or by ITO to dismiss under Rule 12(b)(1) or 12(b)(6), Fed.R.Civ.P.. Accordingly, we were relegated to await the trial to determine the facts and whether admiralty jurisdiction obtained. *Doris Trading Corp. v. SS Union Enterprise, supra,* at 1096; *Marubeni-Iida (American), Inc. v. Nippon Yusen Kaisha,* 207 F.Supp. 418, 420 (S.D.N.Y.1962).

### The Contract

Mormac's claims are asserted under an existing "Memorandum of Agreement" ("the contract"), entered into by it and ITO on October 1, 1976 (Plaintiff's Trial Exhibit "3"; hereinafter "Pl's. Ex."). That contract applied to work to be done by ITO at Mormac's 23rd Street Terminal, Brooklyn, New York, where the cargos here involved were loaded or unloaded to and from Mormac's vessels, and stored. We shall also consider a contract entered into between the parties on April 1, 1968 ("the 1968 contract"), which relates to work to be performed by ITO at Mormac's terminal facilities at Elizabeth, New Jersey. Although the 1968 contract is entitled "Stevedoring Agreement", it, in fact, like the 1976 contract, provided that ITO render both terminal as well as stevedoring services. We are here guided, of course, by the terms of the relevant 1976 contract, but shall distinguish the two contracts, insofar as they may shed light as to the intent of the parties concerning the responsibilities of ITO under the 1976 contract.

**3.** Justice Rehnquist, in his concurring opinion in *Director Etc. v. Perini North River Associates,* [459] U.S. [297], 103 S.Ct. 634, 652 [74 L.Ed.2d 465] (1983), would define longshoremen (or ste-

The 1976 contract, in pertinent part, provides that:

1. The contract is to "govern" two distinct and separate activities to be performed by ITO. The first is "loading and unloading" Mormac's vessels and furnishing "services customarily performed by a ... stevedore".[3] Further, ITO bound itself to "receiving and delivery of cargo" and, in that connection, to perform the "functions and services customarily performed by a terminal operator". The services to be performed by ITO, both as a stevedore and as a terminal operator, were to be paid for by Mormac in accordance with separate rate schedules attached to the contract. (*See,* Pl's. Ex. "3", the contract, at 1 and schedules attached).

2. The stevedoring operations are more particularly set forth in the contract. For example, ITO is required to "[d]ischarge cargo from or load cargo into vessels' holds, tweendecks, on deck, shelter or bridge spaces, deep tanks...." (Pl's. Ex. "3", at ¶ 2(d)). The terminal operations are also set forth. For example, ITO is to "sort and stack cargo upon discharge of vessel or breakdown cargo on pier upon loading of vessel"; to perform "long hauling" within the pier and "farm" area; "reasonable sorting of cargo"; "truck loading and unloading and assisting delivery"; "normal coopering"; "cleaning and general housekeeping of 23rd and 25th Street areas", etc. (*Id.,* at ¶¶ 2(f)(g)(j)(p)(q)).

3. ITO is required to supply all cargo handling gear and equipment for use in performance of its obligations (*Id.,* ¶ 6, p. 7).

4. ITO agreed to "be legally liable ... for damage to or loss of cargo through its negligence." Further, "loss or damage to cargo ... shall be limited to actual damage caused by the negligence of [ITO] engaged in receiving and delivery of cargo, and the shifting, loading or discharging of cargo." (*Id.,* at ¶ 8). In this connection, ITO agreed to "assume full responsibility" for "mis-

vedores) as those "who typically load and unload vessels". *See also,* Black's *Law Dictionary,* 5th Ed., at 1268.

loading or failure to load cargo ... or in cross-delivery of cargo". (*Id.*, at ¶ 21).

5. Demurrage charges belong to Mormac, but demurrage reports are required to be completed by ITO's clerks on forms furnished by Mormac. (*Id.*, at ¶ 24).

6. As part of its terminal functions, ITO is required to furnish clerical personnel, including tallymen for delivery (to consignees) and receiving cargo (from shippers), and was required to issue receipts for delivered cargo on Mormac's forms and as its representative. ITO may collect and retain charges for loading and unloading cargo to and from delivery trucks. (Such charges are usually paid by the consignees). (*Id.*, at ¶¶ 2(b), 5).

7. ITO guaranteed to secure other shipping lines to use the terminal at "a maximum of 100,000 tons per year at $1.50 per manifest ton for side and top wharfage." (*Id.*, at ¶ 34).[4]

The 1968 contract, ¶ XI, at 9, (Pl's. Ex. "2") holds ITO liable, in part, for "loss of cargo overside" due to its negligence. That paragraph further provided that in "receiving, delivering and storing of cargo [ITO] is acting as an agent of Moore-McCormack and as such, is not to be considered as a bailee of the cargo." Further, Paragraph XVIII provided that that contract shall "constitute the full agreement of the parties and no warranty of any nature shall be implied from any of the wording of this agreement."

Mormac's Contract Administrator, Caspare V. Curcuru ("Curcuru"), testified that he, on behalf of Mormac, negotiated the 1976 contract with ITO (Tr. 13) *, and that he eliminated the above-quoted language of the 1968 contract from the 1976 contract, because he "felt that the responsibility for the proper handling of the cargo was not properly represented, ... in the old [1968] agreement, and I thought that the responsibility should be fixed on [ITO] the stevedore and terminal operator, so that I revised these and excluded them from the new [1976] contract." (Tr. 14).

It was clear then, and I find, that it was Mormac's intent under the contract to hold ITO responsible, if negligent, for any cargo loss while in its hands, anywhere within the terminal area, and that Mormac disclaimed none of the usual implied warranties that may be legally inherent under such contract. I further find that ITO understood such meaning.

## THE TRIAL AND FACTUAL FINDINGS

Three witnesses testified; Curcuru and Nelson Aviles ("Aviles"), Mormac's Claims Adjuster, on behalf of Mormac, and John Flynn ("Flynn"), ITO's Brooklyn Area Manager, for ITO. A number of exhibits were also placed in evidence.

The 23rd Street Terminal ("the terminal") is leased by Mormac from the City of New York (Tr. 7) and all appurtenances belong to Mormac, including a covered storage "shed" running almost the entire length of the 23rd Street pier. The terminal includes piers at 23rd and 25th Streets, buildings at the foot of both piers, weighing scales outside and close to the buildings at the 23rd Street pier and a large outdoor storage area.[5] (Pl's. Ex. "1"). There are two gates leading into the piers; one at 23rd Street, the other at 25th Street, guarded solely by Mormac's security personnel. After discharge, cargo is moved by ITO into and placed for storage in the shed to await delivery to consignees and also places cargo in that shed after its receipt

---

**4.** Mormac's Contract Administrator, Caspare V. Curcuru testified that "side wharfage" is the fee paid to Mormac by other carriers for tying-up (as "dockage") at Mormac's pier, while "top wharfage" represents the fee paid to Mormac for taking up place with cargo upon the pier. (Tr. 70–72) *

* "Tr." represents the trial transcript; the numbers following represent the pages thereof.

**5.** For a further description of the terminal, *see, Minemet, Inc. v. M.V. Mormacdraco*, 536 F.Supp. 769, 770, 772 (S.D.N.Y.), *aff'd. Mem.*, 714 F.2d 115 (1982). Apparently, although not testified to here, the terminal was enclosed, at all times relevant, by "a cyclone-wire fence 8–10 feet high topped with barbed wire". *Id.*, at 772.

 from shippers to await loading by ITO onto and into Mormac's vessels. Trucks enter through the 23rd Street gate to deliver outbound cargo, while they enter through the 25th Street gate to receive delivery intended for the consignees (Tr. 5–7, 63, 66). Mormac furnishes not only the gate guards but all the other guards to secure the terminal; none are supplied by ITO, (Tr. 37, 66–67), nor is ITO required to do so under the contract.

When outbound cargo is brought by truck onto the pier, entry is made through the 23rd Street gate and is unloaded by ITO personnel, who check the shipper's documents and the quantities of cargo, issue a receipt therefor and remove it for storage into the shed or elsewhere onto the pier to await loading onto Mormac's intended vessel. ITO determines where the cargo is to be placed within the shed and they have the sole responsibility in moving the goods within the shed. Mormac has no receiving functions, which is handled exclusively by ITO (Tr. 24–34, 36, 68, 346).

When cargo is to be delivered to consignees, their trucks enter through the 25th Street gate; the trucker alights from his truck, enters ITO's receiving office where he receives a "truck pass". He then drives his truck over a scale to assure it is empty, then ITO personnel examine the shipper's documents in the possession of the trucker, which identifies the type and quantity of goods to be delivered, tallies the same and loads it into the truck and secures a receipt from the trucker for such delivery on forms supplied by Mormac. As provided by the contract, the charges for such truck loading is retained by ITO. The truck is then weighed, as loaded; the weight is checked by an ITO "checker" and then exits the terminal. (Tr. 34–36, 74, 273, 346).

It is noted that all operations above described, that is, the receipt after unloading of cargo from shippers' trucks, checking their documentation, counting the cargo, moving cargo and situating it for storage in specified areas within the shed, moving it from place to place within the shed,

delivering cargo into consignees' trucks, counting the same, and securing receipts from the truckers for such delivery, are all terminal services performed by ITO, which, of course, are distinct from that of stevedoring. Stevedoring involves only loading from or unloading onto the stringpiece, and upon loading, stowing the same in a secure manner within the vessel. At times, as ordered by the carrier, but not here involved, stevedoring includes counting certain valuable cargo during discharge.

As to incoming cargo and before it is unloaded, ITO prepares a "sort sheet", securing the necessary data to be included therein from the manifest supplied by Mormac (Tr. 293–294). It is ITO's responsibility to sort out the arriving cargo and to designate specified areas within the shed where each cargo is to be stored to await delivery to the intended consignees. After unloading at shipside—an ITO stevedoring function—ITO moves the cargo with its own equipment, after sorting, into the shed and into the pre-determined area in the shed for storage. As to export cargo, ITO transports it with its own equipment from the storage shed to shipside, where it remains ready for loading by ITO onto and into Mormac's vessels (Tr. 23–36, 235, 293).

The sort sheet (and there are a number in evidence) is a significant document, indeed. Thus, we describe it in some detail. The sort sheet is divided into eight columns. The first column indicates the numbered location where a specific cargo has been placed in the shed by ITO. The location numbers appear on the wall and ceiling of the shed. The second column consists of ITO's sort number assigned to a cargo and appear in sequence starting at the top of the sheet with number "1". When that number is circled, it means that the "whole consignment" has been seen, after placement, in that location by ITO's "location man". The third, fourth and fifth columns contain "marks and numbers", identifying the cargo. Column seven states the quantity of the cargo in the designated area,[6] while the eighth and last column, describes the commodity there situated (Tr. 106–109).

---

**6.** Mormac's witness, Aviles, testified that col-

umn six states the quantity of the cargo (Tr.

All notations on the sort sheet are made by ITO personnel and none by Mormac.

After ITO places the cargo in the assigned area of the shed, its "location man" or other worker assigned therein to count the cargo, counts it to ascertain that it aggregates the amount manifested, and, if so, circles the sort number appearing in the second column of the sort sheet. If such employee finds that any part of the total manifested is missing, he records the amount missing, usually in the seventh column of the sort sheet (and, at times, in other columns), and usually by a red marking. If no such notation is made, it means

and confirms that ITO has received and placed the full manifested consignment in the assigned area of the shed. (Tr. 108–110).[7]

Although Mormac's complaint alleges that the subject cargo "was lost and/or otherwise damaged" by ITO, we find that the proof, in fact, assert claims for lost, rather than damaged, cargo.[8] Further, we find that the losses, if any, occurred, in fact, in the course of ITO's rendition of terminal services, and, particularly, while in storage in the shed rather than while rendering stevedoring services; and that is also Mormac's position.[9]

---

107). That appears patently incorrect. It is plain that the quantities are cited in column seven. Most of column six on each sort sheet is blank. Where numbers are written in that column, they may somehow refer also to quantities, but the witness and the others failed to clarify the matter.

**7.** ITO's witness, Flynn, testified that the sort sheet does not reflect an accurate count by ITO personnel of the number of pieces "that come off the ship" and that they do not count the pieces of cargo *during discharge* from the vessel, unless requested to do so by Mormac, who is required to pay ITO, separately and additionally, for such tally. (Tr. 296–297). We agree, but that is not in issue. Aviles testified that ITO counts the separate cargos in the storage shed after they transport it into that area. He did not testify, nor was he questioned, whether or not ITO tallies cargo during unloading.

Flynn appears to agree that the sort sheet represents a true count by ITO of cargo it places in the shed. He testified that "[I]t [the sort sheet] is composed [by ITO] as against the manifest to see that if we do get *this cargo* from the vessel upon discharge in New York." (Tr. 293) (emphasis supplied). It was clear to us, that in referring to *this cargo*, Flynn was asserting that the sort sheet reflected not only the type or description of cargo received by ITO, but reflected, as well, the quantity received as counted. In any event, we credit Aviles' testimony in this regard and find that the sort sheets reflect, in part, the precise quantity of cargo received and stored by ITO and that the precise amount of pieces is ascertained by ITO by count and, further, that any discrepancy in quantity as against the manifest, is precisely and carefully noted by ITO on that document. Our finding is borne out by the testimony and by a number of sort sheets in evidence, reflecting exact amounts missing. *See*, Tr. 151–157, 168, 179–181, 191–192, 203–204; Pl's. Exs. "9D", "11C", "12C".

**8.** In that lost, rather than damage, of cargo is here claimed, is confirmed in Mormac's Pre-Tri-

al Memo. of Law, at 1–5, in its Post-Trial Memo. of Law, at 2, 3, 21–22, 23 and in its Supplemental Post-Trial Memo. of Law, at 21–22. Mormac's claim is that, with respect to incoming cargo, all was loaded on Mormac's vessels at ports of loading, "and all of the cargo shown as loaded was fully discharged by the respective vessels onto the pier at 23rd Street terminal", and after so discharged, "the cargo disappeared, without apparent explanation, from the pier after discharge from the vessel and before its delivery to the consignee." Further, "it is clear", maintains Mormac, "that ITO was the custodian of the cargo while on the pier and is responsible to Mormac under the agreement for the loss of cargo in question."

As to the one export cargo involved, similarly, it is Mormac's claim that ITO received from the shipper the full cargo of refined peanut oil and that while in ITO's possession, a portion thereof was lost and the full cargo was never stowed by ITO in Mormac's outgoing vessel. *See*, Mormac's Post-Trial Memo., at 24–25 and its Supplemental Post-Trial Memo., at 12.

**9.** Schedule "A", attached to the Complaint, indicates that the cargos were "on pier", which presupposes that discharge had been completed intact, after which ITO "received" the respective cargos for further handling. The same conclusion may be drawn relative to the one export claim, this is, the cargo was "on pier" in ITO's hands, stored and then loaded short. Accordingly, that claim also is that while in the hands of ITO, during the period it was rendering terminal services, a portion of the cargo was lost.

Further, in its Post-Trial Memo., at 3, Mormac quotes from the contract and emphasizes a portion of the same, as follows: "The contractor [ITO] will perform as provided for specifically herein the *duties, functions, and services customarily performed by a terminal operator* and stevedore." By failing to underline "and stevedore", Mormac reminds us that its complaint

We find that the losses occurred during storage and before loading the one export cargo or before delivery to consignees of the other cargos, upon the following facts:

1. With respect to the one export cargo, listed as the first item on said Schedule "A" (attached to complaint), 8311 cartons of refined peanut oil were received on February 14, 1978 by ITO, after counting by Aviles of Mormac and checked and signed as correct by ITO's checker on the Dock Receipts (Tr. 134–135; Pl's. Ex. "7A"). It then was brought into and stored in the shed by ITO until loading on or about February 25, 1978 (Pl's. Ex. "7D", Mormac's trace letters to its foreign offices). The four bills of lading covering this shipment for 8311 cartons were issued February 24, 1978 (Pl's. Ex. "7B"). The claim is that, although 8311 cartons were received, counted and stored by ITO on February 14, 1978, it loaded into Mormac's vessel 2706 cartons short eleven days later. I find that 8311 cartons were received by ITO, as indicated by the Dock Receipts, and stored by it in the shed, after which it disappeared.[10]

2. With respect to the seven inbound cargos, none of the sort sheets prepared and maintained by ITO, shows that ITO failed to receive and store the quantities of cargos manifested and as indicated on the bills of lading (see, Pl's. Exs. "5C", "6C", "8C", "9D", "12C").

3. As to the seventh import shipment listed on Schedule "A", (a shipment of 300 cartons of cashew nuts loaded on the S/S "Mormacmoon"), the documentation (Pl's. Exs. "11A" and "11B") demonstrates that 300 cartons were loaded; however, after placement in storage, ITO found and counted, as received by it, only 150 cartons (Pl's. Fx. "11C"; Tr. 191–192), but later found an additional 40 cartons, and ITO finally delivered to the consignee a total of 190 cartons (Tr. 193–195; Pl's. Ex. "11D"). The remaining and lost 110 cartons, may or may not have been received by ITO, and if re-ceived, were undoubtedly lost in storage. In light of our decision, we need not make a final determination on this issue.

## DISCUSSION

### SUBJECT MATTER JURISDICTION

The complaint charges violation of the contract. Whether an admiralty cause of action arises from a contract depends upon its subject matter. *New England Marine Ins. Co. v. Dunham*, 78 U.S. 1, 26 [20 L.Ed. 90] (1870); *Cory Bros. & Co. v. United States*, 51 F.2d 1010, 1011 (2d Cir.1931); *P.D. Marchessini & Co., (N.Y.) v. Pacific Marine Corp.*, 227 F.Supp. 17, 18 (S.D.N.Y. 1964); 14 Wright, Miller and Cooper, *Federal Practice and Procedure* (1976), § 3675, at 305–06 (hereinafter "Wright & Miller"). We know, and as Justice Harlan reminded us, "[t]he boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 [81 S.Ct. 886, 890, 6 L.Ed.2d 56] (1961); *CTI–Container Leasing v. Oceanic Operations*, 682 F.2d 377, 379–80 (2d Cir.1982) ("The precise categorization of the contracts that warrant invocation of the federal courts' admiralty jurisdiction has proven particularly elusive." * * *. Generally, the answer may lie from 'rulings in like or analogous situations.'"). We begin with the dubious knowledge that the nature of the contract has an essence in admiralty if it "has reference [or is related] to a maritime service or a maritime transaction", *Pillsbury Flour Mills Co. v. Interlake S.S. Co.*, 40 F.2d 439, 440 (2d Cir.), *cert. denied*, 282 U.S. 845 [51 S.Ct. 24, 75 L.Ed. 750] (1930); *Marubeni-Iida (American), Inc. v. Nippon Yusen Kaisha*, *supra*, 207 F.Supp., at 419; 1 *Benedict on Admiralty* § 182 (1983) (hereinafter "Benedict"), or can be said to constitute "a mere incident to maritime transportation", *Pillsbury Flour, supra*, at 440, *quoting, The*

---

against ITO relates to its performance as a terminal operator, rather than to its functions as a stevedore. *See also*, n. 8.

**10.** We make no finding as to how the cargos were lost, nor fault for the losses, since Mormac failed to prove negligence on the part of ITO,

which proof devolved upon them under the circumstances of this case, as we shall see hereinafter. Our finding is limited to the fact that the cargos were lost after placement in storage; we need go no further.

*Richard Winslow,* 71 F. 426, 428 (7th Cir. 1896); *Marubeni-Iida, supra,* at 419; *Oliver J. Olson & Co. v. Marine Terminals Corporation,* 215 F.Supp. 490, 492 (N.D. Cal.1962), or possesses a "maritime flavor", encompassing the "performance of an actual 'maritime service'" and, thus, presents the "qualitative prerequisite" for admiralty contract jurisdiction. *Pierside Terminal Operators, Inc. v. M/V Floridian,* 423 F.Supp. 962, 968, 970 (E.D.Va. 1976). These generalities may give some overall direction, but not the answer. For that, we must look to the terms of the specific contract to assure that "the transaction relates to ships and vessels, masters and mariners, as the agents of commerce...." *Kossick v. United Fruit Co., supra,* 365 U.S., at 736 [81 S.Ct. 890], *quoting,* 1 *Benedict,* at 131 (now § 182, at 11–5), and is "incident" to maritime carriage. *Pillsbury Flour Mills Co. v. Interlake S.S. Co., supra,* 40 F.2d, at 440.

ITO urges that the court lacks subject matter jurisdiction, (*See,* ITO's Post-Trial Memo., at 3–12), in that, the claims do not raise a federal question cognizable in admiralty within the purview of 28 U.S.C. § 1331. The question was not raised prior to or during trial but, of course, is timely at any time, as aforesaid. Rule 12(h)(3), Fed. R.Civ.P.

Clearly, the losses here involved are alleged to have occurred after full discharge of the inbound cargos, and with respect to the one export cargo, before loading. Accordingly, we are not concerned with the stevedoring services provided for in the contract. Admittedly, those functions are clearly maritime.[11] *American Stevedores v. Porello,* 330 U.S. 446, 456 [67 S.Ct. 847, 852, 91 L.Ed. 1011] (1947); *Cory Bros. & Co. v. United States, supra,* 51 F.2d, at 1011. ITO posits, then, that since the losses allegedly occurred during the terminal operations, that is, while ITO was rendering terminal services, (also provided in the contract), we have here "a contract for mixed services", one maritime in nature (stevedoring) and the other non-maritime (terminal services).[12] Further, it maintains that the portion of the contract providing for terminal services is separable from the

**11.** Mormac cites a number of cases (*see,* Mormac's Supplemental Post-Trial Memo., at 23–25) to the effect that a stevedoring contract is maritime in nature and, thus, within federal admiralty jurisdiction. A number of cases involve claims by a stevedore injured in the course of stevedoring, who sued the carrier and the carrier impleaded the stevedore's employer. Reliance on these cases is misplaced. We agree that a stevedoring contract and the stevedoring function is within federal admiralty jurisdiction, but that is not what is here essentially involved. Here we direct our attention to the non-maritime portion of the contract—the terminal services function—, particularly, storage and the act of storage.

**12.** We should put to rest Mormac's argument that the contract in issue is a "wharfage" contract and thus a maritime contract, within federal admiralty jurisdiction. Mormac's Supplemental Post-Trial Memo., at 23. A wharfage contract is within maritime jurisdiction, *Ex Parte Easton,* 95 U.S. 68 [24 L.Ed. 373] (1877); Gilmore and Black, *The Law of Admiralty* (1975), at 22, but that is not what we have or deal with here. "Wharfage" is defined in *Howmet Corporation v. Tokyo Shipping Co.,* 320 F.Supp. 975, 978 (D.Del.1971), as follows:

"Wharfage" is the fee charged for the temporary use of a dock furnished in the ordinary course of navigation to a ship for the purpose of mooring in safety in order to load and unload cargo, to receive and land passengers, to make temporary repairs and to refuel, resupply and reprovision. (cases cited). All of the services embraced in wharfage are intimately related to and are essential incidents to a ship in the ordinary course of navigation. As the United States Supreme Court stated in *Ex Parte Easton,* supra, 95 U.S. at 73 [24 L.Ed. 373]: "Wharf accommodation is a necessity of navigation, and such accommodations are indispensable for ships * * * whether employed in carrying freight or passengers. * * * [Wharves] are constructed to enable ships * * to lie in port in safety, and to facilitate their operation in loading and unloading cargo and in receiving and landing passengers.

The court continued:

Wharfage, however, *does not extend to the storage of cargo, as this service is not an essential incident to navigation.* Cargo may be loaded and unloaded without first being stored for any length of time on the wharf. In the instant case, according to the complaint, the cargo was unloaded on the pier on or about November 2, 1965. The voyage had then been completed, the cargo had been discharged and all maritime services, including wharfage, had ended. Simply holding the bulk of the cargo on the pier from November 2nd until after December 31, 1965 to await removal by the consignee became a matter of inland storage with the City acting as warehouseman. This storage was entirely un-

agreement to provide stevedoring services, and therefore, if the terminal services provided by ITO is not maritime in nature, there is no admiralty jurisdiction, and lacking diversity, the action should be dismissed. The argument possesses persuasive attributes and, and surely, cannot be dismissed out of hand.

Where a contract is divisible and separable, only the maritime portion of the contract may be heard in admiralty. *Berwind-White Coal Mining Co. v. City of New York*, 135 F.2d 443, 447 (2d Cir.1943); *Pillsbury Flour Mills Co. v. Interlake S.S. Co., supra*, 40 F.2d, at 440–41; *Compagnie Francaise De Navigation A Vapeur v. Bonnasse*, 19 F.2d 777, 779 (2d Cir.), *cert. denied, sub nom., American Exchange Irving Trust Co. v. Bonnasse*, 275 U.S. 551 [48 S.Ct. 114, 72 L.Ed. 421] (1927); *Luvi Trucking, Inc. v. Sea-Land Service, Inc.*, 650 F.2d 371, 373 (1st Cir.1981). Claims under the non-maritime portion of the contract would only remain as pendent state claims.

We agree and find that the contract is separable. Mormac also appears to agree and Curcuru so testified (Tr. 23), in that, the stevedoring and terminal provisions are "pretty much distinct and apart" with "two separate and distinct rates in the agreement, Exhibit 3, one for stevedoring and one for terminal operators". We have found that the losses involved occurred in the course of ITO's storage of the cargos

in the shed awaiting delivery to the consignees, or, in the one case, awaiting loading into Mormac's vessel. The function of placing the cargos in storage, not constituting a part of the stevedoring function, represents a part of the terminal services ITO agreed to furnish. We must then address the question whether storing or storage alone constitutes "a mere incident to maritime transportation", and possesses a sufficient measure of "maritime flavor", referable and related to "a maritime service or a maritime transaction". At first blush, one would think so.

ITO insists that the maritime commerce had been completed with the full discharge of the ships and that the terminal services then ensuing, particularly, the cargos' storage in the shed, are non-admiralty functions and that the courts have consistently so held, citing a number of cases. Specifically, ITO maintains, as to the import cargos:

> The use of the terminal during this period [after discharge and expiration of "free time", while incurring demurrage] certainly was not in any way a maritime matter relating "to the ship as an instrument of commerce". It was the same as a shoreside warehouse. The maritime transportation had long since ceased and any relationship of ITO to the ship and to its vessel loading and discharging duties under the [contract] were completed.

ITO's Post-Trial Memo., at 9–12.

Free time [13] had expired and demurrage incurred as to all cargos.[14]

---

related to navigation. From that point on, the relationship between Howmet and the City was not maritime in nature. The City was not providing the consignee with wharfage service because the extended storage, during which the alleged rust damage occurred, did "not pertain to the navigation of a ship, nor assist a vessel in the discharge of a maritime obligation." (cases cited) (emphasis supplied)

The Federal Maritime Commission's regulation, 46 CFR § 533.6(d)(1) and (2), would define "terminal services" to include the charges for "dockage" and "wharfage". But, nowhere in Part 533, under which that regulation appears, or elsewhere in the Regulations, or in the Shipping Act of 1916, (46 U.S.C. § 801, *et seq.*), pursuant to which the Regulations were promulgated, is there anything intimating that a contract for dockage or wharfage is anything but a maritime, rather than a non-maritime, contract,

or that the act of tieing to a wharf is not a maritime function within federal admiralty jurisdiction, or that rendering all kinds of terminal services, including storage and the act of storing, are incident to navigation and, thus, within such admiralty services. Storage and the act of storing and most other, if not all, terminal services are non-maritime functions, outside federal admiralty jurisdiction.

**13.** "Free Time" is officially defined as—
> The specified period during which cargo may occupy space assigned to it on terminal property free [of charge] immediately prior to loading or subsequent to the discharge of such cargo on or off the vessel.

46 CFR § 533.6(d)(3).
Charges, after expiration of free time, incur "demurrage" charges (46 CFR § 533.6(d)(4)). Free time at the Port of New York extends for at

**14.** See note 14 on page 1421.

Since, as the cases indicate, the carrier's (Mormac) and its agent's (ITO) obligations under a bill of lading ("a maritime contract") "continue to govern the relationship between shipper and a carrier after discharge but before delivery", *Leather's Best, Inc. v. S.S. Mormaclynx, supra,* at 807, 811; *David Crystal, Inc. v. Cunard Steam-Ship Co.,* 339 F.2d 295, 297 (2d Cir. 1964), *cert. denied, sub nom., John T. Clark and Son v. Cunard Steamship Company, Ltd.,* 380 U.S. 976 (1965), then does not the function of storage, (at least during free time), representing, as it does, a usual and necessary activity prior to delivery, also relate to and constitute an obligation and "maritime service", cognizable under federal admiralty jurisdiction? Again, one would think so and some older cases appear to say so. *Pillsbury Flour Mills Co. v. Interlake S.S. Co., supra,* 40 F.2d, at 440 (If "the storage were a mere incident to the transportation, the entire contract would be held to be maritime and within the admiralty jurisdiction", *quoting, The Richard Winslow, supra,* 71 F., at

428; *Marubeni—Iido (American), Inc. v. Nippon Yusen Kaisha, supra,* at 419; [15] *Oliver J. Olson & Co. v. Marine Terminal Corporation, supra,* at 491–492.[16] *See also, Doris Trading Corp. v. SS Union Enterprise, supra,* 406 F.Supp., at 1096.

It is now clear that storage contracts and cargo losses occurring during periods of storage, whether on the pier or elsewhere, are not cognizable as maritime activity and, thus, outside federal admiralty jurisdiction, *Colgate Palmolive Co. v. S/S Dart Canada,* 724 F.2d 313, 316–17 (2d Cir.1983), *cert. denied,* [—] U.S. [——], 104 S.Ct. 2181 [80 L.Ed.2d 562] (1984); *Pillsbury Flour Mills Co. v. Interlake S.S. Co., supra,* at 440–41; *Luvi Trucking, Inc. v. Sea-Land Service, Inc., supra,* 650 F.2d, at 373 ("[C]ontracts involving cargo are maritime only to the extent the cargo is on ship or being loaded on or off a ship"); *Howmet Corporation v. Tokyo Shipping Co.,* 320 F.Supp. 975, 977 (D.Del.1971) (and cases therein cited), and constitute only pendent, state claims. *Colgate Palmolive Co. v. S/S Dart Canada, supra,* at 315; *Leather's Best, Inc. v. S.S. Mormaclynx, supra,*

least five (5) days (exclusive of Saturdays, Sundays and legal holidays) after complete discharge of the vessel. 46 CFR § 526.1(a) and (b); Pl's. Ex. "4", at 16.

14. For example, the first cargo listed on Schedule "A" (attached to complaint) states that the cargo was "on pier" January 31 to February 24, 1978, and then loaded. The second cargo was "on pier" April 10, 1978 and delivered short on April 21 and 28, 1978, as shown by the delivery receipt (Pl's. Ex. "9E"); the third cargo "on pier" February 12, 1978 and delivered short to consignee's trucker on March 31, 1978 and April 11, 1978 (Pl's. Ex. "8D"). The others also indicate that they remained on pier beyond the five-day free time.

15. In *Marubeni—Iida, supra,* 207 F.Supp., at 419, the court had this to say:

It is clear that admiralty has no jurisdiction over an action for damage to cargo being held for storage purposes (case cited), but the courts are not agreed on whether admiralty has jurisdiction over an action for damage to cargo held in a dock warehouse prior to loading (cases cited). I think it more reasonable to hold that if the cargo is on the wharf as an incident to maritime carriage, whether before loading or after unloading, the action is within the admiralty jurisdiction.

The court failed to define or explain what type or period of storage constitutes "an incident to maritime carriage." Would losses during "free time" storage constitute such incident to maritime carriage, while storage incurring demurrage remove it from federal admiralty jurisdiction and, if so, why? *Marubeni—Iido* supplies no answer.

16. *Olson* follows *Marubeni-Iida* and both cases were before the respective courts on motions comparable to what would be considered today's motions for summary judgment or a motion to dismiss under Rule 12(b)(1) or Rule 12(b)(6), Fed.R.Civ.P.

Those motions having been denied, *Marubeni-Iida* was held for trial to ascertain whether the losses occurred during a nonmaritime storage or storage "incidental to maritime carriage", which the court, apparently, deemed within admiralty jurisdiction. In *Olson,* the court decided that the storage contracts "were incidental to the maritime events" and retained jurisdiction.

In *Howmet Corporation v. Tokyo Shipping Co., supra,* 320 F.Supp., at 978 the court characterized the *Olson* decision as an "aberration" and contrary to "all other decisional law on the subject", holding that cargo loss or damage while held in storage is outside of federal admiralty jurisdiction.

451 F.2d, at 808; *Minemet, Inc. v. M.V. Mormacdraco*, 536 F.Supp. 769, 771 (S.D. N.Y.), *aff'd, Mem.*, 714 F.2d 115 (2d Cir. 1982).

### FEDERAL JURISDICTION RETAINED

Since we find that all eight losses occurred during storage, we then have only state claims before us, all of which would ordinarily be dismissable as not within the admiralty jurisdiction of the court, there being no federal claim upon which the state claims would attach as pendent. However, if the complaint appears to set forth even one substantial federal claim, all the others being pendent claims, the court would have the discretionary "power" to hear the pendent claims as well. *Hagans v. Lavine*, 415 U.S. 528, 542–43 and n. 10 [94 S.Ct. 1372, 1381–82 n. 10, 39 L.Ed.2d 577] (1974) (substantiality to be determined only by reference to the pleadings, not upon the evidence produced at trial); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 727 [86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218] (1966); *Uptown People's Com., Etc. v. Bd. of Com'rs, Etc.*, 647 F.2d 727, 733 (7th Cir.), *cert. denied*, 454 U.S. 866 [102 S.Ct. 328, 70 L.Ed.2d 167] (1981) ("[E]ven one substantial claim may be enough to support jurisdiction"); *Nolan v. Meyer*, 520 F.2d 1276, 1278 (2d Cir.), *cert. denied*, 423 U.S. 1034 [96 S.Ct. 567, 46 L.Ed.2d 408] (1975); *A.H. Emery Company v. Marcan Products Corporation*, 389 F.2d 11, 20 and n. 10 (2d Cir.), *cert. denied*, 393 U.S. 835 [89 S.Ct. 109, 21 L.Ed.2d 106] (1968) (same as *Hagans*); [17] *Hirsch v. du Pont*, 396 F.Supp. 1214, 1229 (S.D.N.Y. 1975).

Viewing the complaint with required liberality, we cannot say that it "clearly" asserts only insubstantial claims or that the substantial claims were "made solely for the purpose of obtaining jurisdiction". *A.H. Emery Company v. Marcan Products Corporation, supra*, 389 F.2d, at 20, n. 10, *quoting, Bell v. Hood*, 327 U.S. 678, 682 [66 S.Ct. 773, 776, 90 L.Ed. 939] (1946). In examining the complaint, ¶¶ 7, 8, we are unable to clearly determine whether the allegations charge that all the losses occurred solely during storage, or if some occurred during the maritime function of loading or unloading. For example, with respect to the first claim appearing on Schedule "A", (attached to the complaint), we know it involved an export cargo for it names a "shipper", while all the others name the "consignee", indicating import cargos. We also know, as indicated on Schedule "A", that the first cargo was allegedly situated complete "on pier" from January 31, 1978 to February 24, 1978, when it was then loaded. However, we do not know by merely examining the complaint, to which we are restricted in determining the court's "power" to entertain the action as one in admiralty, whether the losses are claimed to have occurred during loading or otherwise. Given such doubt, we should and do resolve the question in favor of jurisdiction, for "the test for dismissal is a rigorous one and if there is any foundation of plausibility to the claim federal jurisdiction exists" 13B Wright and Miller, § 3564, at 70–71. *Also, Hagans v. Lavine, supra*, at 537–538 [94 S.Ct. at 1379]. *Baker v. Carr*, 369 U.S. 186, 199 [82 S.Ct. 691, 700, 7 L.Ed.2d 663] (1962) ("That the claim is unsubstantial must be 'very plain.'", *quoting, Hart v. B.F. Keith Vaudeville Exchange*, 262 U.S. 271, 274 [43 S.Ct. 540, 541, 67 L.Ed. 977] (1923)); *T.B. Harms Company v. Eliscu*, 339 F.2d 823, 828–29 (2d Cir.1964), *cert. denied*, 381

**17.** Our Circuit tells us in *A.H. Emery Company v. Marcan Products Corporation, supra*, 389 F.2d, at 20, n. 10 that although substantiality is ordinarily determined on the basis of the pleadings (citing *Gibbs*, at 727), "it is doubtful that a plaintiff could create 'power' in a federal court over a claim of state law by including in the complaint a federal allegation which it knows at the time to be wholly frivolous and regarding which it never intends to present evidence at trial."

We find that the federal allegations of the complaint were not intended by Mormac merely to place the cause within federal jurisdiction or that it never intended to present proof relative thereto. We find, rather, that at the time the complaint was filed, Mormac did not know, with any measure of certainty, that all losses resulted during storage or, in fact, occurred during a marine activity, such as stevedoring.

U.S. 915 [85 S.Ct. 1534, 14 L.Ed.2d 435] (1965).

Given the power to entertain the complaint, the inquiry then proceeds to the question whether we should exercise our discretion to do so. *Leather's Best, Inc. v. S.S. Mormaclynx, supra,* 451 F.2d, at 809; *Meyerhofer v. Empire Fire & Marine Ins. Co.,* 74 F.R.D. 151, 153 (S.D.N.Y.1977).

If no federal claims remain before the court prior to trial, the state claims should be dismissed, absent "exceptional circumstances." *Kavit v. A.L. Stamm & Co.,* 491 F.2d 1176, 1179–80 and n. 4 (2d Cir.1974); *Nolan v. Meyer, supra,* 520 F.2d, at 1280. However, where such state claims would be time-barred in the state courts upon federal dismissal, then such fact would constitute "exceptional circumstances", justifying federal retention. *Garner v. Pearson,* 732 F.2d 850, 854 (11th Cir.1984), *quoting, Pharo v. Smith,* 625 F.2d 1226, 1227 (5th Cir.1980); *Meyerhofer v. Empire Fire & Marine Ins. Co., supra,* at 154.[18]

Here, were Mormac relegated to the state courts, a number of the claims arising in 1978, would normally be time-barred under New York's six year statute of limitations (*see,* CPLR § 213(2)), were it not for the saving grace of CPLR § 205(a), which reads as follows:

Termination of action.

(a) New action by plaintiff. If an action is timely commenced and is terminated in any other manner than by a voluntary discontinuance, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits, the plaintiff, or, if he dies, and the cause of action survives, his executor or administrator, may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the termination provided that the new action would have been timely commenced at the time of commencement of the prior action.

*See also, Dunton v. County of Suffolk,* 729 F.2d 903, 911 n. 8 (2d Cir.1984); 1 Weinstein-Korn-Miller, *New York Civil Practice,* at 2–128-2–132. Accordingly, dismissal of the complaint here, before dealing with the merits, would not foreclose Mormac from instituting a new action in the state courts, and, therefore, that reality should, in the usual case, militate against federal retention. However, we have already had a completed three day trial with three witnesses testifying at length, all, unfortunately, made necessary by ITO's failure (until filing of its Post-Trial Memo. *see,* p. 18 hereinabove) to alert us, through a dispositive motion, of a probable jurisdictional defect. *A.H. Emery Company v. Marcan Products Corporation, supra,* 389 F.2d, at 20–21 (where judge failed to dismiss, prior to trial, pendent state claim because he was not alerted to the jurisdictional problem, thus, court did not abuse its discretion in retaining same). The plaintiff Mormac has invoked federal jurisdiction and will not be heard to complain now for receiving that which it sought. The parties, each of them, have already incurred considerable expenses; the repetition of such expenses, we are confident, they would wish to avoid. And there has been, additionally, expenditure of considerable judicial time, which may have to be needlessly repeated were this case relegated for retrial in the state courts. Given such considerations, Judge Brieant in *Welch Foods, Inc. v. Goldman, Sachs & Co.,* 398 F.Supp. 1393, 1401–02 (S.D.N.Y. 1974), was moved to retain jurisdiction over pendent state claims. However, unlike *Welch Foods,* where the motion to dismiss on jurisdictional grounds and to refuse retention of pendent claims was made during trial after only plaintiffs put in their case (398 F.Supp., at 1394), here, the entire trial has been completed, giving, we submit, added reason to retain jurisdiction and to complete the case with our decision, without foisting a new trial upon the state

---

**18.** In *Federman v. Empire Fire and Marine Ins. Co.,* 597 F.2d 798, 809, n. 18 (2d Cir.1979), our Circuit indicated that the district court in *Meyerhofer* acted permissably within its discretion in retaining jurisdiction because of the imposition of a possible statutory time bar were the case relegated to the state courts.

courts, much burdened as is our own. *McLaren v. Cowen & Co., supra,* 660 F.2d, at 848 ("The recognition of pendent jurisdiction depends entirely on the practical consideration of avoiding a retrial of factual issues that are necessarily involved in a trial of the same operative facts (*citing, Gibbs* [383 U.S.] at 726 [86 S.Ct. at 1139] )"); *Kavit v. A.L. Stamm & Co., supra,* at 1180 n. 4 ("Exceptional circumstances" justifying federal retention, "might be found when the defendant [as here] fails to call the court's attention to the weakness of the federal claim before the court has invested a substantial amount of time in the case .... or when dismissal of the pendent claims would otherwise sharply clash with the directive in *Gibbs* that pendent jurisdiction serve the ends of 'judicial economy, convenience and fairness to litigants' (*quoting, Gibbs,* at 726 [86 S.Ct. at 1189] )."). If the justification for the exercise of pendent jurisdiction "lies in the consideration of judicial economy, convenience and fairness to litigants", *United Mine Workers v. Gibbs, supra,* 383 U.S., at 726 [86 S.Ct. at 1139], then, for the reasons noted, we are satisfied that there is no lesser justification here to deal with all the claims. Accordingly, we exercise our power and discretion in retaining jurisdiction.

## BAILMENT AND THE IMPLIED WARRANTY OF WORKMANLIKE SERVICE

Mormac posits that upon receipt of the cargo after unloading or after receipt of the one outbound cargo from the shipper, ITO acted as a bailee of such goods while in its custody. Further, Mormac contends that under bailment principles, it has made out a *prima facie* case of negligence as against the bailee, ITO, "by showing that the cargo was received by the carrier [Mormac] in good order and condition, that such cargo was delivered, in total, to the bailee and that there was an [unexplained] failure to then deliver the goods as required." Also, such proof, says Mormac, is sufficient to demonstrate, *prima facie,* ITO's breach of its implied warranty of workmanlike performance. (Mormac's Pre-Trial Memo., at 7–12; Mormac's Post-Trial Memo., at 14–20).

It, thus, appears that Mormac proceeds upon two separate fields of attack. One being, that the relationship between the parties establishes a bailment and, given such bailment, the onus is placed upon ITO to come forward with a reasoned explanation demonstrating it is free of negligence in failing to deliver, merely upon Mormac's proof that ITO received the goods and failed to deliver it when required. Stated differently, it would appear that Mormac's position is that upon demonstrating that the manifested cargo was received by ITO and that ITO failed to deliver all of it, then it devolves upon ITO to establish, by a preponderance of proof, its freedom from negligence, and that ITO would fail in carrying its burden if it merely maintained, "we don't know what happened to cause the losses".

Mormac's second thrust is that, under the contract, ITO impliedly warranted to Mormac that it would perform its responsibilities in a workmanlike manner, and that it breached such warranty of workmanlike performance in failing to deliver that which it received. Here too, Mormac maintains that it has established a *prima facie* case merely by proof that ITO received the full amount of cargo and then failed to deliver the total received. The proof of receipt and failure to deliver raises the same presumption of negligence, says Mormac, as under the bailment principle and requires ITO to come forward to demonstrate its freedom from negligence, which, Mormac insists, ITO has failed to do.

ITO's position is that Mormac and not ITO was the terminal operator, and as such, had the "ultimate responsibility for the care and custody of all cargo stored in that [terminal] area, and [had] the primary authority to direct how such cargo should be stored and secured"; that the relationship between the parties was not one of bailment, and, thus, ITO was not a bailee; that "ITO acted at all times as agent to Mormac with respect to the cargos, which remained in the exclusive possession of Mormac as bailee"; that ITO agreed "to perform labor services only" by loading, unloading, receiving and delivering cargo and was not obliged to safekeep the same

while in storage, which was Mormac's responsibility, as the provider of a security force for that purpose (ITO's Pre-Trial Memo., at 2–12; ITO's Post-Trial Memo., at 27–40).

Firstly, we should put to rest whether ITO was the terminal operator at the 23rd Street Terminal at all relevant times, or was that position filled by Mormac, as ITO insists.

Clearly, ITO was the terminal operator as established by the Port of New York Marine Terminal Tariff in evidence, *see,* Pl's. Ex. 4, at 4–4A, 7, which tariff is required to be filed with the Federal Maritime Commission under the Shipping Act of 1916 (46 U.S.C. § 816 and 46 CFR §§ 533.-1–533.6). As a terminal operator, ITO bound itself, both in the filed tariff and under the contract, for damage or loss to cargo resulting through its negligence, in part, during performance of its "terminal services". (*See,* Pl's. Ex. 4, at 5, Item 6; the contract, ¶ 8). Such "terminal services" would include "handling" (moving cargo from one point to another and moving the same after discharge into the storage shed), "checking" (counting and checking cargo against appropriate documents), and the like. *See,* 46 CFR § 533.6(d).

The fact that ITO was the terminal operator places no different or greater responsibility upon it other than is provided in the contract and tariff, and that is to perform with care and diligence, and failing therein, to be liable for damages resulting from their negligence.

## A. *Bailment*

Jurisdiction has been accepted not because the claims arise from admiralty activity, but for other reasons we have delineated above. We have also discussed and found that the losses occurred during storage, a non-admiralty function, and, thus, only state claims are involved. As a consequence, we are relegated to and must apply New York's state law in seeking our answers. Mormac urges, in part, that the legal relationship between the parties herein was that of a bailment, with Mormac as bailor and ITO as bailee. The presumption of negligence and other legal consequences

flow only if a bailment can be said to exist under the facts here. We are not satisfied that a bailment is here evident and, given that determination, the rebuttable presumption of negligence does not obtain and, thus, Mormac was obliged to establish ITO's negligence, which it has failed to attempt or to accomplish. Having failed to prove negligence, Mormac is similarly foreclosed from a recovery of damages under the contract, which permitted damages only if the losses resulted "through its [ITO's] negligence". (The contract, at ¶ 8). Further, as we shall see hereinafter, there is no state warranty implied in a contract to perform services, which is all that is here involved. Thus, Mormac, under the circumstances before us, is not aided by any presumption.

A bailment is pivoted upon a determination whether possession and control of property has been transferred and the nature or extent of such transfer. It has been said that "[o]ne of the essential elements of a bailment is that the property be taken into the possession of the bailee. .... It all depends upon the facts." *Osborn v. Cline,* 263 N.Y. 434, 437 [189 N.E. 483] (1934). The test then, "is whether or not the person leaving the property has made such a delivery as to amount to a relinquishment of his exclusive possession, control and dominion thereof, and vested such control and dominion in the person upon whose premises the property has been left." *Phillips v. City of New York,* 71 Misc.2d 861, 337 N.Y.S.2d 303, 306 (Civil Ct., N.Y.Co.1972).

Stated somewhat differently, it has been also said that to constitute a bailment "there must be a full transfer of property so as to exclude the possession of the owner and all other persons and give to bailee sole custody and control thereof." 5 N.Y. Jur. Bailments § 26; *Armstrong v. Sisti,* 242 N.Y. 440, 442 [152 N.E. 254] (1929 [1926]) ("Custody of property [must be] relinquished by its holder and entrusted to the person claimed to be a bailee"); *Charles J. King, Inc. v. Barge "LM–10",* 518 F.Supp. 1117, 1124 (S.D.N.Y.1981) (There is no bailment where "possession of the property was not exclusive.").

Significantly, "there can be no bailment when custody and control of property is retained by the holder though another party may have placed himself in a position which imposes upon him some obligation of care in regard to the property." *Armstrong v. Sisti, supra* [242 N.Y.] at 446 [152 N.E. 254]. It is the "degree of control", *Union Marine & General Ins. Co. v. American Export Lines, Inc.*, 274 F.Supp. 123, 130 (S.D.N.Y.1966), relinquished by the owner (the alleged bailor) and transferred to the alleged bailee which determines the existence of a bailment. *Osborn v. Cline, supra* [263 N.Y.] at 437–38 [189 N.E. 483]; *Ellish v. Airport Parking Co. of America, Inc.*, 69 Misc.2d 837, 331 N.Y. S.2d 283, 286 (Sup.Ct., App.Tm., 2d Dept. 1972), *aff'd*, 42 A.D.2d 174, 345 N.Y.S.2d 650 (App.Div. 2d Dept.1973).

Given a bailment, then, under federal, as well as state law, the (rebuttable) presumption of negligence arises upon the bailor's *prima facie* case, showing delivery to bailee and the failure to return at the required time. *Leather's Best, Inc. v. S.S. Mormaclynx, supra,* at 812; *Minemet, Inc. v. M.V. Mormacdraco, supra,* 535 F.Supp., at 771; *I.C.C. Metals, Inc. v. Municipal Warehouse Co.*, 50 N.Y.2d 657, 666 [431 N.Y.S.2d 372, 409 N.E.2d 849] (1980); *Ellish v. Airport Parking Co. of America, Inc., supra,* 345 N.Y.S.2d, at 652. However, "it is established law that no inference of negligence against the bailee arises if his possession of the [lost] bailed property was not exclusive of that of the bailor (case cited)." *United States v. Mowbray's Floating Equip.*, 601 F.2d 645, 647 (2d Cir.1979). *Also, Charles J. King, Inc. v. Barge "LM–10", supra,* 518 F.Supp., at 1124.

In *Minemet, Inc. v. M.V. Mormacdraco, supra,* Judge Weinfeld was faced with facts, insofar as they are here relevant, precisely those we face. Mormac and ITO were defendants there, being sued by a consignee/purchaser for loss of an entire container shipment of tin ingots, shipped from Brazil and stored at the very same pier (23rd Street, Brooklyn) here involved. Also, the very same contract between Mormac and ITO was involved there, as here. The loss there occurred about January 18, 1980, during the same period some of the losses occurred here.[19] Of course, the claim against Mormac was within the court's admiralty and maritime jurisdiction (536 F.Supp., at 770), while the consignee's claim against ITO, the court properly held, was a pendent claim for resolution under New York law, based upon common law liability for tortious conduct.

Judge Weinfeld found, as we do, that "Mormac operated and controlled the piers at the Terminal and provided all security for the piers and the cargo stored there, including gatemen and security guards", and that under the contract, ITO "provided stevedoring services customarily performed by a terminal operator which included discharging cargo from the vessels, *storing* ... and delivery of cargo. ITO discharged and placed cargo onto the piers in consultation with Mormac." (*Id.*, at 770) (emphasis supplied). Further, Judge Weinfeld found, as we find, that

> The entire terminal was enclosed by a cyclone-wire fence 8–10 feet high topped with barbed wire, and a Mormac guard was stationed at each gate entrance to a pier. Only authorized ITO and Mormac employees were admitted to the piers to carry out their assigned tasks and other persons had to identify themselves as having legitimate business to be admitted to the pier areas.

*Id.*, at 772.

As between the consignee and Mormac, the court held Mormac to be a bailee under the bill of lading (the contract of carriage) and ITO, as Mormac's agent, " 'apparently occupied as well the status of a bailee with respect to the shipper' ", *Id.*, at 770–71, *quoting, Leather's Best, supra,* 451 F.2d, at 813. Of course, as Judge Weinfeld noted, the bailment related to ITO's relationship "with respect to the shipper" and had no reference to the relationship between ITO and Mormac. Nowhere, does Judge

---

**19.** The losses here occurred during the period from 1978 to 1981, as indicated by dock and delivery receipts. (*See,* Pl's. Exs. "5D", "6E", "7A", "11D", "12D" and "12F").

Weinfeld state or intimate that the relationship between Mormac and ITO was that of bailor and bailee, with ITO acting as bailee.

We know that the entire terminal was under lease by Mormac, including the shed and pier upon which it stood (Tr. 7) and that ITO had no proprietary or tenancy interest in that property. Mormac supplied all the security at the terminal; they "employ gatemen [and guards] at the proper gates. We [Mormac] employ a roundsman,[20] who is supervisor and oversees the operation insofar as security, and we employ guards on the pier itself." (Tr. 37, 61). The guards appear to be everywhere, "at the north side of the shed, another on the south side, another in the crib. We have a guard at 25th Street, in various locations, at the stuffing and stripping stations, at ship's side, various places." (Tr. 65-66). There is no requirement, by contract or otherwise, that ITO supply any security (Tr. 67), nor did they supply any security during the workday, either within or about the shed or anywhere else, or after their personnel left after the day's work. ITO personnel usually work till 5:00 p.m. and, at times, on an overtime basis, to 9:00-10:00 p.m. However, when they leave the only security present at the terminal, which is open "round the clock", are Mormac's guards. (Tr. 66-67, 85, 324). Although only ITO men transport the cargos within the shed, Mormac maintenance crews and private repair contractors have access to it to perform necessary maintenance work, day or night, and have unhindered access to it after ITO workers leave in the evenings. (Tr. 74, 85-86, 325). The doors to the shed are never locked, but merely closed by ITO personnel when they leave, and when, inadvertently, ITO men fail to close them, they are closed by Mormac's personnel (Tr. 85-86, 325-326). However, the shed doors facing inland are never closed and remain forever open, giving ready access to the shed by Mormac people and others (Tr. 325-326).

It is difficult to understand how ITO can be said to retain unfettered possession and control of the cargo while in storage within the shed when ownership of the shed (with some doors always open) and all adjoining areas of the terminal remain uninterupted in Mormac, who alone is responsible for all security. Surely, we cannot say that there is exclusive or any control retained by ITO after its day's work ends, normally at 5:00 p.m. Further, the contract makes no provision obligating ITO to "mind" the cargo while in storage, nor do we find that it otherwise agreed to do so. *Charles J. King, Inc. v. Barge "LM-10", supra,* 518 F.Supp., at 1124. Even were it to be inferred that ITO, by its conduct, imposed upon itself an obligation to care for the cargos while its personnel were present at the pier and in the shed, nevertheless, there would be no bailment since we find that overall and substantial custody and control thereof was retained by Mormac until delivery. *Armstrong v. Sisti, supra,* 242 N.Y., at 446 [152 N.E. 254]. We independently agree with Judge Weinfeld, in his findings in *Minemet, Inc., supra,* at 770, that "Mormac operated and *controlled* the piers at the [23rd Street] Terminal and provided all security for the piers *and the cargo stored there,* including gatemen and security guards." (emphasis supplied). There being no bailment in the relationship between the parties, Mormac, to recover damages, was obliged to affirmatively establish, as required by the contract, ITO's negligence, and could not avail itself of the presumption of negligence, as would be its privilege, were there a bailment.

Mormac has insisted that a bailment existed and proceeded at trial on "the theory of bailment", claiming ITO to be the bailee and Mormac the bailor (Pl's. Pre-Trial Memo., at 7-9; Pl's. Post-Trial Memo., at 14-20). Accordingly, all Mormac sought to prove, as its *prima facie* case, was delivery[21] of the complete cargo to ITO, the

20. A "roundsman", as we can understand, is a guard/foreman who walks through the areas of the terminal, particularly the piers, to assure all is in order and that all the guards are properly stationed and performing their assigned duties (Tr. 61).

21. Mormac sought to establish such delivery, as to the inbound shipments, by offering proof that

alleged bailee, and ITO's failure to deliver the full cargo to the consignees when required. As to the one outgoing cargo, Mormac again attempted to establish delivery of the full cargo to ITO and its failure to load all of it on Mormac's outgoing vessel. Mormac proceeded no further, it presumed the presumption, and urged that the duty to explain the losses and its freedom from negligence devolved upon ITO, the alleged bailee. It presented no proof of ITO's negligence and in failing to do so, it failed in its proof under the contract.

### B. *Warranty of Workmanlike Services*

Mormac also proceeded on the theory that under the contract, ITO failed in its duty to perform in a workmanlike manner and thus violated its implied warranty of workmanlike performance.[22]

The principle of attaching an implied warranty of workmanlike services or, as stated at times, an implied warranty of workmanlike performance, to maritime contracts appears to have had its genesis in *Ryan Stevedor. Co. v. Pan-American [Atlantic] Steam. Corp.*, 350 U.S. 124 [76 S.Ct. 232, 100 L.Ed. 133] (1956). It was formulated to fill a particular need to permit carriers to secure indemnity from the stevedore-employer upon payment to a stevedore-employee for injuries sustained in the course of stevedoring. (*See, Fairmont Ship. Corp. v. Chevron Internat'l Oil Co., Inc.*, 511 F.2d 1252, 1255–58 (2d Cir.), *cert. denied*, 423 U.S. 838 [96 S.Ct. 66, 46 L.Ed.2d 57] (1975) as to the history which made *Ryan* necessary).

*Ryan*, for the first time, permitted the carrier indemnification for such payments in its suit against the stevedore-employer and, to accomplish that result, read into the contract between them a warranty of work-

manship services. The effect of such warranty presumes negligence on the part of the stevedore-employer, who is then obliged, to avoid liability, to come forward with proof rebutting such presumption. *Stein Hall & Co., Inc. v. S.S. Concordia Viking*, 494 F.2d 287, 290 (2d Cir.1974) ("Failure on the part of the stevedore to explain what occurred to the cargo in its control gives rise to a presumption that stevedore breached this implied warranty."). The logic for the presumption is that the stevedore-employer is in the best position to know how and why his employee was injured and to have taken measures to prevent the accident. *Fairmont Ship. Corp. v. Chevron Internat'l Oil Co., Inc.*, supra, 511 F.2d, at 1257–58. See also, *David Crystal, Inc. v. Cunard Steam-Ship Co.*, supra, 339 F.2d, at 299.

In *Italia Societa v. Oregon Stevedoring Company*, 376 U.S. 315, 321–22 [84 S.Ct. 748, 752–53] (1964), the Supreme Court explained and extended the *Ryan* doctrine to declare its application to non-negligent as well as negligent conduct, that is, the warranty may be breached by non-negligent as well as negligent conduct by the stevedore-employer.

*Ryan* and *Italia*, as we noted above, involved indemnification to a carrier from a stevedore-employer for damages paid to an injured stevedore and the aforesaid warranty was formulated to meet the peculiar need generated by the facts there and was thought to be limited to those facts. However, in *David Crystal, supra*, it was applied and extended to a different situation. There, it was applied to a contract between a carrier and stevedoring firm, wherein the carrier sought indemnity from the stevedore who had misdelivered a cargo to a

---

the full cargos were loaded at the foreign parts, that the bills of lading established the carrier's full receipt (*see, Stein Hall & Co., Inc., v. S.S. Concordia Viking*, 494 F.2d 287, 290–91 (2d Cir.1974)); that ITO received the same and placed them in the shed, and there counted and recorded such full counts on the sort sheets. As to the one export cargo it attempted to show full delivery to ITO by the shipper, loading of the cargo but receipt thereof was short at the intended foreign port.

**22.** Mormac has never disclaimed its right under the warranty. In fact, as we have previously noted, it deliberately omitted from the existing contract (of 1976) the provision (¶ XVIII), appearing in a prior (1968) contract with ITO (Pl's. Ex. 2), reading:

> This contract constitutes the full agreement between the parties hereto and no warranty of any nature shall be implied from any of the wording of this agreement.

thief under a forged delivery order. In *Stein Hall, supra,* the warranty was applied to a similar situation but, there, although "no one [knew] what caused the loss" (494 F.2d, at 289), the stevedoring firm completely operated the terminal and it was found that the stevedores had taken possession of the cargo and that it was under their control and, thus, "it became a bailee for the mutual benefit of the carrier and consignees", unlike here. (*Id.,* at 290).

Mormac relies essentially on these and several similar cases for its position that the warranty applies here. It maintains that "[u]nder its stevedoring contract with Mormac, ITO gave an implied warranty for workmanlike service to competently perform the ocean carrier's statutory and contractual obligations for the loading, discharge, receipt and delivery of the cargo in a safe and workmanlike manner", citing *Ryan.* (Pl's. Post-Trial Memo., at 16).

Firstly, we note our finding above that the contract is separable and that the losses occurred during storage—the non-maritime function of the contract—and not under the maritime "stevedoring" portion of the contract, as Mormac would appear to suggest. Further, both in *Ryan* and *Italia, supra,* the warranty was applied to "a maritime contract" involving stevedoring, a maritime function "governed by federal law" *Ryan* [*Italia* ], *supra,* 376 U.S., at 324 [84 S.Ct. at 754]. In *Crystal,* as well, the loss occurred before storage and promptly after unloading, and, in fact, the thieves came upon the scene to steal the cargo while "Clark's stevedores were unloading" (339 F.2d, at 297), and, thus, the maritime function was not fully completed. In *Stein Hall,* the court applied the warranty under its "stevedoring contract", citing *Ryan* and *Crystal,* but did not apply it with respect to its functions as a terminal operator. With respect to the latter function, the court held (unlike here) the stevedores to be a bailee, because it fully operated the terminal and "had taken control of the cargo" and as such bailee, their "failure to account ... constitutes negligence as a matter of law". (494 F.2d, at 290). Accordingly, it is clear that the implied warranty of workmanlike service is to be limited to federal law. However, under the circumstances here we are relegated to the application of New York state law, to which we now address ourselves.

It is plain that to the extent that ITO obligated itself under the contract to move the cargos from the stringpiece and into their pre-determined places in the shed for storage, or from the shed to shipside, represented fulfillment of an obligated "service", and nothing more.

Under New York law there is no implied warranty that a service will be performed with care and expertise, thus, casting upon the defendant the onus of proving his freedom from negligence. Under service, as distinguished from sales contracts, only the common law, general rules of negligence would apply. In *Milau Associates v. North Ave. Development,* 42 N.Y.2d 482, 486 [398 N.Y.S.2d 882, 368 N.E.2d 1247] (1977), which Judge Tenney characterizes as "the leading case on this issue", *Schulman Inv. Co. v. Olin Corp.,* 477 F.Supp. 623, 629 (S.D.N.Y.1979), New York's ultimate court reaffirmed the essential holding of *Perlmutter v. Beth David Hosp.,* 308 N.Y. 100, 104 (1954), by quoting therefrom that " 'when service predominates, ...', the exacting warranty standards for imposing liability without proof of fault will not be imported from the law of sales...." In rejecting the plaintiff's claim for breach of an implied warranty of fitness, the court noted that the contract involved "a predominantly labor intensive endeavor, [as here] ... the workmanlike performance of a construction service". (*Id.,* at 488 [398 N.Y.S.2d 882, 368 N.E.2d 1247]). Further, it stated:

As suggested in *Perlmutter,* those who hire experts for the predominant purpose of rendering services, relying on their special skills, cannot expect infallibility. Reasonable expectations, not perfect results in the face of any and all contingencies, will be ensured under a traditional negligence standard of conduct. In other words, unless the parties have contractually bound themselves to a higher standard of performance, reasonable

care and competence owed generally by practioners in the particular trade or profession defines the limits of an injured party's justifiable demands (e.g. *Aegis Prods. v. Arriflex Corp. of Amer.*, 25 A.D.2d 639, 268 N.Y.S.2d 185 [recognizing that in cases where "the service is performed negligently, the cause of action accruing is for that negligence", and "if it constitutes a breach of contract, the action is for the breach"] ).

*Id.*, at 486 [398 N.Y.S.2d 882, 368 N.E.2d 1247]. *Also, Gordon v. Holt*, 65 A.D.2d 344, 412 N.Y.S.2d 534, 537 (App.Div. 4th Dept.1979), wherein, then presiding Appellate Division Justice and now our Associate Circuit Judge, Richard J. Cardamone, noted, for a unanimous court, that "New York does not recognize a cause of action based upon breach of an implied warranty where, as here, only economic loss is claimed and where the warranty arises from a contract for services ... (cases cited)"; *Sala v. Tomlinson*, 73 A.D.2d 724, 422 N.Y.S.2d 506, 508 (App.Div. 3rd Dept.1979) ("New York does not recognize a cause of action based upon breach of warranty arising out of the performance of services (cases cited))."

Given the absence of an implied warranty under New York law, Mormac was required to establish ITO's negligence. It failed to do so.

For all the foregoing reasons, we find that Mormac has failed to carry its burden. Accordingly, judgment may be entered in favor of ITO, dismissing the complaint, with costs and disbursements in its favor.